**Robert William LABRUM, Petitioner,**

v.

**UTAH STATE BOARD OF PARDONS, H.L. Haun, Chairman of the Utah State Board of Pardons, and Tommy House, Warden of the Utah State Prison, Draper Facility, Respondents.**

No. 920222.

Supreme Court of Utah.

Dec. 6, 1993.

---

V. Lowry Snow, Lewis P. Reece, St. George, for petitioner.

R. Paul Van Dam, Atty. Gen., Kirk M. Torgensen, Lorenzo Miller, Asst. Attys. Gen., Salt Lake City, for respondents.

Craig S. Cook, Salt Lake City, for amicus inmates of Utah State Prison.

Joan C. Watt, Salt Lake City, for amicus Salt Lake Legal Defenders.

DURHAM, Justice:

Petitioner Robert William Labrum petitions this court for an extraordinary writ directing the Utah Board of Pardons (the Board) to disclose its entire file on him or a summary of its contents, afford him the opportunity to rebut any misinformation in the file, vacate its determination of his original parole release date, and rehear his parole request. We grant the writ.

In March 1987, Labrum pleaded guilty to manslaughter, a second degree felony. The plea agreement required Labrum to disclose information leading to the location of the victim's body, in exchange for which the State dismissed charges of witness tampering, obstruction of justice, and second degree murder. The parties also agreed that Lab-

rum should undergo psychological testing, evaluation, and treatment.

Labrum was sentenced in May 1987 to a term of one to fifteen years and fined $5000. The trial judge forwarded to the Board a recommendation that Labrum serve ten years of the sentence before being considered for parole.

In June 1987, the Board notified Labrum that his initial parole determination hearing was scheduled for November of that year. At the hearing, the Board considered his criminal history, the presentence investigation report prepared for the sentencing judge, his family history, statements to his friends, entries in his journal, his participation in a college program and substance abuse therapy at the prison, prison disciplinary information, petitions from community members, and reports from prison staff alleging displays of threatening behavior. Labrum's parents spoke on his behalf at the hearing.

The Board informed Labrum at the hearing that the Utah Sentence and Release Guidelines (Guidelines)[1] recommended that he serve at least thirty-six months of the fifteen-year term. Notwithstanding the Guidelines, the Board determined that Labrum should "expire" his sentence, meaning that he should serve the entire fifteen years and be released in 2002. The Board chairman stated, "This is one of the few cases, Mr. Labrum, in which it is the consensus of the board that it's a pity we didn't have longer than 15 years to keep you."

In his petition to this court, Labrum asserts that he was not informed of the procedures by which he could have obtained advance notice of the information used against him at the parole determination hearing. None of the materials apparently containing adverse information used at the hearing had been disclosed to him prior to the hearing. Because of this nondisclosure, on October 15, 1990, Labrum requested a special attention hearing; the Board denied the request. Labrum asked for rehearing, and that request was likewise denied. Labrum's counsel again requested a rehearing in October 1991, in part because of Labrum's inability to review the contents of his file at or prior to the parole determination hearing. The Board responded with a letter to counsel explaining that an offender may have access to only those portions of his file deemed "public documents"; however, the Board did not identify or provide any documents with the letter.

In March 1992, Labrum's counsel requested Labrum's entire file. The Board responded by providing copies of all documents not designated confidential, including petitions from the community, newspaper clippings, letters from Labrum's friends and family, letters from counsel, and internal Board reports. However, the Board refused to disclose post-sentence or investigative reports, letters from the victim's family, and other information Labrum and his counsel believed would have been helpful in preparing rebuttal to the allegations against him. Labrum filed this petition for an extraordinary writ in April 1992 pursuant to rule 65B(e) of the Utah Rules of Civil Procedure and rule 19 of the Utah Rules of Appellate Procedure.

Amicus curiae briefs have been filed through counsel by a number of inmates at the Utah State Prison, asking this court to undertake a due process review of virtually all of the Board's rules and practices regarding parole. While we hope this opinion clarifies the scope of due process requirements in original parole release proceedings, we decline the invitation to undertake a sweeping review of the parole system. Instead, we address only the specific questions raised by petitioner, namely, whether due process requires (1) that an inmate receive adequate notice to prepare for a parole release hearing, and (2) that an inmate receive copies or a summary of the information in the Board's file on which the Board will rely. We answer both questions in the affirmative.

The concept of parole in American theory and practice dates back to the 19th century:

> The first official recognition [of parole] came in 1876 at New York's Elmira Reformatory. Parole for juveniles, sometimes referred to as "aftercare," can be traced

1. See discussion of Utah Sentence and Release Guidelines, *infra.*

back to the houses of refuge for children established in the latter half of the 19th century. Juvenile parole developed for many years as part of the general child welfare field, but recently, while still retaining a close involvement with child welfare programs, has assumed a more distinct status.

Robert M. Carter & Leslie Wilkins, *Probation and Parole: Selected Readings* 185 (1970). Its expansion has been constant, particularly in the field of adult corrections. *See generally* Joseph A. Zechman, Casenote, *Constitutional Law—Due Process in Federal Parole Recission Hearings—Green v. McCall, 822 F.2d 284 (2d Cir.1987),* 61 Temple L.Rev. 1509 (1988). The theoretical underpinnings of parole have been said by one commentator to include

> three basic concepts of what happens when a prisoner is paroled: (1) grace or privilege—the idea that the offender could be kept in prison for his full sentence but the government gratuitously extends him the privilege of release; (2) contract or consent—the idea that the government makes a deal with the offender, letting him out in return for his promise to abide by certain conditions; and (3) custody—the idea that a parolee, even though free, is in the keeping of the government.

David T. Stanley, The Brookings Institution, *Prisoners Among Us: The Problem of Parole* 1 (1976) [hereinafter Stanley].

That same commentator observes, based on his research and analysis, "how far reality deviates from these rationales." *Id.* This discussion illustrates the complex operation of parole in real life:

> Parole board members and parole officers must work daily with prison administrators, judges, prosecutors, and police. Differences in judgment on decisions and priorities must be reconciled; detailed complexities in processing have to be adjusted. Hence, boundary lines are not clear, and one criminal justice agency gets involved in the work of another. Parole actually serves a complex of functions and is related to decisions made by other parts of the criminal justice system.

> ● *Parole is sentencing.* Boards decide how long criminals stay in prison. Hence parole is also a way of controlling prisoners: well-behaved inmates are more likely to be released.

> ● *Parole is policing.* Some parole officers make searches and have power to arrest.

> ● *Parole is attempted rehabilitation.* Parole officers offer counseling, referral, and job-finding services.

> ● *Parole is re-imprisonment.* Parole officers may propose and boards approve action to put back in prison a parolee who has violated his agreement.

*Id.* at 3–4 (emphasis added).

The conceptual origins of parole have supported a tradition of extreme judicial deference to parole board decision making in both the federal and state systems. Much thoughtful criticism has been directed at this approach, based in large part on an examination of the functional realities of parole in operation. An extensive analysis published in 1975 summarized the problems:

> The inadequacies of traditional justifications for judicial nonintervention, including their failure to conform to legal or social realities, have been well demonstrated. . . . The "act of grace" theory is inconsistent with the legislative purpose of the parole statute, which was to establish an additional mechanism in a unified correction system to promote its penological and rehabilitative purposes. And regardless of whether parole was originally intended to be administered solely to mitigate the harshness of criminal sanctions, it has since come to serve the economic and administrative needs of the courts and penal institutions.

> The *parens patriae* or "rehabilitative expertise" theory for permitting parole boards to exercise unreviewable discretion is also subject to objections. Even though a parole board may conceive of itself as assisting the inmate to achieve rehabilitation ... its decision can have a substantial negative impact on personal freedom. A denial of parole ... results in continued incarceration. In other areas of the law involving restraints on personal liberty,

courts have come to recognize that the decisionmakers' presumed identity of interest with the subject of the decision does not eliminate the need for procedural protections, and this learning should be applicable to the parole process.

In addition to the above criticisms, continuing judicial deference to parole board expertise is mistaken for an even more fundamental reason—it is based upon a misapprehension of the facts concerning a parole board's exercise of its discretionary powers and upon an ignorance of the best social scientific data on the achievement of rehabilitative goals by penal and correctional institutions.

Project, *Parole Release Decisionmaking and the Sentencing Process*, 84 Yale L.J. 810, 846–48 (1975) (citations omitted).

Another extensive conceptual analysis of parole theory is found in a comment by Michael Gottesman and Lewis J. Hecker, *Parole: A Critique of Its Legal Foundations and Conditions*, 38 N.Y.U.L.Rev. 702 (1963). Of the "grace" theory, the author points out:

[T]he sheer volume of prison traffic has rendered grace an obsolete concept.

. . . .

The foundations of the grace theory are unsound. The theory ignores the fact that it is no longer financially possible not to release convicts on parole. And it ignores the proposition that the public safety will be better served by releasing as many convicts as possible under controlled supervision. Grace is out of harmony with the administration of criminal justice.

*Id.* at 705, 708. This article also denigrates the usefulness of the "contract-or-consent" and "custody" theories:

It is time the courts recognized that parole is not a contract reached through bilateral bargaining. The convict cannot determine the conditions of his release, and his consent cannot effect it.

. . . .

The confused application of the custody theory reflects the basic illogic of holding that a man can be at liberty while being in custody. A more realistic method of analysis is to view the parolee as an individual at liberty under certain restraints necessary to insure the success of parole.

*Id.* at 709, 720.

Utah enacted its first parole statute in 1896, authorizing grants of parole by a board of correction. This court struck down the statute because it violated the Utah Constitution's conveyance of the parole power to the Board of Pardons. *State ex rel. Bishop v. State Bd. of Corrections*, 16 Utah 478, 481–82, 52 P. 1090, 1091–92 (1898). At the time of the court's decision, Utah had a system of determinate sentencing whereby the trial judge before whom an offender was convicted imposed a specific term of imprisonment. In that context, the court discussed the nature of parole, describing it as a manifestation of the commutation power (the grace or privilege theory), as constructive restraint (the custody theory), and as release conditioned on promises made by the parolee (the consent or contract theory). *Id.* at 480–82, 52 P. at 1092. In 1899, the legislature adopted a new statute, giving the parole power to the Board of Pardons. Act of March 9, 1899, ch. 39, 1899 Utah Laws 56.

Utah's parole statute has changed little since 1899 and is encompassed in several Code provisions. Section 77–27–9 of the Code grants the Board (1) authority to parole any offender committed to a state correctional facility, (2) absolute discretion in parole decisions, and (3) the power to revoke parole on violation of a release agreement.[2] Section 77–27–11 contains provisions detailing due process requirements for parole revocation proceedings. With respect to what the statute refers to as "original parole grant hearings,"[3] the statute provides:

The Board of Pardons shall determine within six months after the date of an offender's commitment to the custody of the Department of Corrections, for serving

---

**2.** Section 77–27–9 was amended in 1992. *See* Utah Code Ann. § 77–27–9 (1990 & Supp.1993). These amendments, however, do not apply to the issues presently before the court.

**3.** *See* Utah Code Ann. § 77–27–5(2)(a).

a sentence upon conviction of a felony or class A misdemeanor offense, a date upon which the offender shall be afforded a hearing to establish a date of release or a date for a rehearing, and shall promptly notify the offender of the date.

Utah Code Ann. § 77–27–7(1).

Utah has had some form of indeterminate sentencing in place since 1913. *See* Act of March 24, 1913, ch. 100, 1913 Utah Laws 192.

> Utah has long adhered to an indeterminate sentencing philosophy. Under this scheme, the trial judge has no discretion in fixing the term of imprisonment. He or she simply imposes the statutorily prescribed range of years, and the Board of Pardons determines exactly how long the prisoner is to be confined.

*State v. Egbert,* 748 P.2d 558, 563 (Utah 1987) (Zimmerman, J., dissenting). With the exception of certain minimum mandatory sentences where the Board is specifically prohibited from paroling an offender before service of the minimum term of years, the above-quoted description of the Board's function is entirely accurate; the Board "determines the actual number of years a defendant is to serve." *Foote v. Utah Bd. of Pardons,* 808 P.2d 734, 735 (Utah 1991).

An additional important dimension of Utah's sentencing scheme is provided by the Utah Sentence and Release Guidelines, promulgated in 1985 by the Utah Commission on Criminal and Juvenile Justice. The Guidelines have been adopted by the Board of Pardons and are universally relied on by sentencing judges and the Board. The Guidelines contain the following statements of policy:

**Sentencing Judges.**

> Sentencing judges should require that the guideline forms be attached to all district court presentence investigations and may require them at the circuit court level. Judges should release the forms to defense counsel in time for any major disagreement regarding the accuracy of the information to be resolved prior to sentencing. Judges should sentence within the guidelines unless they find compelling aggravating or mitigating circumstances that

would justify departure from the Guidelines.

**Prison.**

> The prison should develop its programming based on the time frames suggested by the Guidelines.

**Board of Pardons.**

> The Board of Pardons should utilize the Guidelines in all of its hearings. It should consider the sentence imposed by the judge as the minimum term if the sentence is consistent with the Guidelines. If the sentence differs from the Guidelines, the Board should evaluate the aggravating and mitigating circumstances noted by the judge. If the Board feels differently about these circumstances than the court, they should notify the court of the reason for the disagreement and the action taken by the Board. Policy also needs to be developed to extend the time served beyond the minimum term indicated by the Guidelines.
>
> . . . .
>
> The Guidelines encourage "truth in sentencing." All parts of the system (including victims and the media) should have a good idea of the disposition and penalty associated with the conviction offense. No longer will presentence investigators and the Board of Pardons attempt to compensate for plea bargaining.

Utah Comm'n on Criminal and Juvenile Justice, Utah Sentence and Release Guidelines (1985), *reprinted in* Utah Code of Judicial Administration app. D, at 1130–31.

Thus, the Guidelines are widely used in Utah to estimate the time a particular defendant should be imprisoned based on the circumstances of the case. Prosecutors and defense counsel refer to the Guidelines in framing plea agreements, defendants rely on them in making judgments about whether to plead guilty or go to trial, presentence investigators use them in making sentencing recommendations, and sentencing judges use them in deciding whether to impose prison terms or probation. The Guidelines constitute predictions about incarceration time that are usually the only relevant information available to defendants about the real effects of a sentence.

After sentencing, the Guidelines are used by prison personnel in making housing assignments and programming decisions concerning inmates and by the Board in establishing release dates. The Board may simply use the matrix contained in the Guidelines to set a release date, or it may rely on factors identified in the Guidelines to extend (or, theoretically, to shorten) the predicted incarceration period. Although the Guidelines have no force of law, they have become, through policy and practice, the device for measuring "normal" terms of incarceration in our indeterminate sentencing scheme. The Guidelines operate to promote uniformity in sentences, reduce the need for trials by encouraging rational plea bargains, and provide incentives for good behavior in prison. Flexibility is maintained for individual cases, but in the aggregate, Utah sentences conform to the matrix established by the Guidelines. The argument in the State's brief that all sentences in Utah are for the maximum years specified in the indeterminate range simply has no basis in fact.[4] The reality is that the Utah corrections system would collapse if maximum terms were served by all or even most inmates.

To the extent that it is responsible for application of the Guidelines, the Board functions as a sentencing entity and decides the term of incarceration. We said quite succinctly in *Foote:*

> If the trial judge sends the defendant to prison, the judge does not determine the number of years the defendant will spend there. That is left to the unfettered discretion of the board of pardons, which performs a function analogous to that of the trial judge in jurisdictions that have a determinate sentencing scheme.

808 P.2d at 735. Numerous other authorities have acknowledged and described the parallels between judicial sentencing and the parole grant function. For example, one authority has written:

> Determinations by Boards of Parole whether and when to release the offender on parole are in some measure equivalent to the sentencing determinations of the judge. Determining when during the offender's term he shall be released approximates the judicial setting of a term of imprisonment. The only difference is the time of the determination: the judicial sentence determines the range of imprisonment at the outset; the parole decision determines the length of the sentence after it is served.

Sanford H. Kadish, *The Advocate and the Expert—Counsel in the Peno-Correctional Process,* 45 Minn.L.Rev. 803, 812 (1961) [hereinafter Kadish].

■ The State correctly argues that before *Foote,* this court had never articulated the theory that "parole is sentencing." In the past, we have generally relied on the traditional theoretical constructs: grace, contract, and continued custody. These constructs have continued viability for understanding and regulating some parts of the parole process, and we emphasize that this opinion deals only with original parole grant hearings, not with parole revocation or disciplinary proceedings. The reality of original release hearings is that they are analogous to sentencing hearings and require due process to the extent that the analogy holds.[5] In this case, we are asked to decide if due process requires timely notice prior to original parole grant hearings and copies of information in the Board's file.

The function and purpose of the original parole grant hearing is to make the first determination of the actual term the inmate is to serve in prison. Of necessity, that determination will be based on factors having to do with the inmate's crime and past history. Later, of course, factors relating to be-

---

4. The argument is also undermined by the provisions of Utah Code Ann. § 76–3–401(4), which cuts off aggregate maximum terms at 30 years notwithstanding their actual total.

5. We agree with the Washington Supreme Court that "due process is flexible and calls for the procedural protections that the given situation demands." *In re Whitesel,* 111 Wash.2d 621, 763

P.2d 199, 203 (1988) (citing *In re Sinka,* 92 Wash.2d 555, 599 P.2d 1275 (1979)). In *Sinka,* the court held that due process for purposes of setting minimum terms must include notification of adverse information in an inmate's file and an opportunity to rebut or to explain. 599 P.2d at 1280.

havior in prison, amenability to rehabilitation programs, commission of other offenses in prison, etc., may come into play, and the Board retains the flexibility to reassess its original decision. Absent the applicability of any of those new factors, however, an inmate has a reasonable expectation that the term decided upon at the original release hearing will turn out in fact to be his or her actual prison term. At the very least, it will operate as a benchmark to assess future status, as occurs when the Board sets no tentative release date but only another hearing date.

■ In view of the critical nature of this determination, due process pursuant to article I, section 7 of the Utah Constitution[6] requires that the inmate know what information the Board will be considering at the hearing and that the inmate know soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies. *See* Stephen A. Fennell & William N. Hall, *Due Process at Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts*, 93 Harv.L.Rev. 1615, 1639 (1980) ("Beyond the Magnitude of the defendant's liberty interest, the other two basic considerations in determining the level of due process required—the risk of an erroneous decision ... and the strength of the government's justifications for not providing disclosure and commentary—also point toward requiring disclosure and commentary as minimum requirements of procedural due process.").

> Even more difficult is the issue of whether to disclose to the inmate what is in his file—that is, what factors are working against his release. Due process considerations argue for letting him see what is in his record.
>
> . . . .
>
> [Valid objections of correctional officials and parole boards] can be mitigated by screening the files to remove some material temporarily or by oral summarization

. . . .

Stanley at 74–75.

At least two critical functions related to fundamental fairness are implicated by a petitioner's request for timely disclosure of information: minimizing error and preserving the integrity of the process itself. Everything this court said regarding presentence investigation reports in *State v. Casarez*, 656 P.2d 1005 (Utah 1982), applies to the materials and information on which the Board relies at an original parole grant hearing:

> It is essential to both the form and substance of a fair proceeding that the defendant have the right to point out errors, misinterpretations, or even to demonstrate that he is not in fact the person who is the subject of the report. Such errors are not unknown. Particularly when the criminal justice system is being pressed to deal with ever more criminal defendants on an impersonal basis ..., the possibility of error becomes even greater.

*Id.* at 1008.

Justice Marshall of the United States Supreme Court elaborated on the problem in the parole context in his dissent in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979):

> In fact, researchers and courts have discovered many substantial inaccuracies in inmate files, and evidence in the instant case revealed similar errors.... In this case, for example, the form notifying one inmate that parole had been denied indicated that the Board believed he should enlist in a self-improvement program at the prison. But in fact, the inmate was already participating in all such programs available.... Such errors in parole files are not unusual. *E.g. Kohlman v. Norton*, 380 F.Supp. 1073 (Conn.1974) (parole denied because file erroneously indicated that applicant had used gun in committing robbery); *Leonard v. Mississippi State Probation and Parole Board*, 373 F.Supp.

---

**6.** For a discussion of the roots and elements of article I, section 7 due process, see *Christiansen v. Harris*, 109 Utah 1, 163 P.2d 314 (1945): In depriving a person of life or liberty, the essentials of due process are ...; (c) notice to the person of the inauguration and purpose of the inquiry and the time at which such person should appear if he wishes to be heard; (d) right to appear in person or by counsel; (e) fair opportunity to submit evidence.... *Id.* at 8, 163 P.2d at 317.

699 (ND Miss.1974), *rev'd,* 509 F.2d 820 (CA5), *cert. denied,* 423 U.S. 998 [96 S.Ct. 428, 46 L.Ed.2d 373] (1975) (prisoner denied parole on basis of illegal disciplinary action); *In re Rodriguez,* 14 Cal.3d 639 [122 Cal.Rptr. 552], 537 P.2d 384 (1975) (factually incorrect material in file led parole officers to believe that prisoner had violent tendencies and that his "family reject[ed] him"); *State v. Pohlabel,* 61 N.J.Super. 242, 160 A.2d 647 (1960) (files erroneously showed that prisoner was under a life sentence in another jurisdiction); Hearings on H.R. 13118 et al. before Subcommittee No. 3 of the House Judiciary Committee, 92d Cong., 2d Sess., pt. VII–A, p. 451 (1972) (testimony of Dr. Willard Gaylin: "I have seen black men listed as white and Harvard graduates listed with borderline IQ's"); S. Singer & D. Gottfredson, Development of a Data Base for Parole Decision–Making 2–5 (NCCD Research Center, Supp. Report 1, 1973) (information provided by FBI often lists same charge six or seven times without showing a final disposition).

*Id.* 442 U.S. at 33 & n. 15, 99 S.Ct. at 2117 & n. 15 (Marshall, J., dissenting).

Beyond the issue of accuracy, there is also a concern for legitimacy that has always animated due process doctrine in the criminal law. Justice Marshall also described it in *Greenholtz:*

[T]his Court has stressed the importance of adopting procedures that preserve the appearance of fairness and the confidence of inmates in the decisionmaking process. The Chief Justice recognized in *Morrissey* [v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484] that "fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." 408 U.S. at 484 [92 S.Ct. at 2602] (citation omitted), a view shared by legislators, courts, the American Bar Association, and other commentators. This consideration is equally significant whether liberty interests are extinguished in parole release or parole revocation proceedings.

*Id.* 442 U.S. at 34, 99 S.Ct. at 2117 (Marshall, J., dissenting). Over thirty years ago, Professor Kadish articulated the theory on a more general plane:

It has not escaped those who have been concerned with the institution of procedural regularity that one of its prime contributions is as a psychological stabilizer; acceptance of law is substantially furthered to the extent that those subject to its rule observe its workings with consistent, scrupulous fairness.

Kadish at 836. Accuracy and fairness are essential in proceedings which impinge as directly on personal liberty as original parole grant hearings.

The interests of both society and criminal offenders are best served when fairness and accuracy are assured at all stages of the sentencing and correctional process. An offender's perception of fairness in the criminal justice system is thought to promote rehabilitation. Accurate sentencing and parole decisions also further society's interest in ensuring that offenders will be returned to society neither sooner nor later than is appropriate.

Finally, the criminal justice system as a whole values and protects accuracy and the appearance of fairness.... For the approximately ninety percent of all criminal defendants who plead guilty, ... sentencing and parole represent the primary basis for evaluating the fairness of the criminal justice system.

Note, *A Proposal to Ensure Accuracy in Presentence Investigation Reports,* 91 Yale L.J. 1225, 1241–42 (1982).

■ The Board expresses concern in this case that some of the information in its files is sensitive and requires protection of potentially vulnerable informants. Where confidentiality of sources is absolutely required, the Board may of course take suitable steps to withhold the identity of sources and prepare summaries of the information for the inmate's use rather than providing copies of the actual documents. Other relevant documents, such as copies of the presentence investigation report (which should already have been made available to defendant before his court sentencing hearing, *see State v. Lipsky,* 608 P.2d 1241 (Utah 1980); *State v. Casarez,* 656 P.2d 1005 (Utah 1982)), and

post-sentence reports should simply be provided to the inmate along with notice of the hearing. We acknowledge that these requirements may add administrative burdens for the limited staff of the Board. To the extent that the Board functions as a sentencing entity in our system, however, it must have the resources and support staff to perform that function properly. It has never been an option for the government to argue that constitutional due process need not be provided because it creates administrative burdens.

■ As noted above, the articulation of the view that the establishment of an original parole release date is inherently a sentencing function, although inescapable in light of Utah's evolving sentencing system, is not reflected in our decisions prior to *Foote*. Some of the language in this court's older parole cases applied to determinate sentencing, and many of those opinions did not deal with original parole release hearings. Nonetheless, we now wish to make clear that we disavow implications contrary to the holding of *Foote* in our prior opinions and in those of the court of appeals. *See, e.g., Hatch v. Deland*, 790 P.2d 49 (Utah Ct.App.1990); *Hall v. Utah Bd. of Pardons*, 806 P.2d 217 (Utah Ct.App.1991). For purposes of original parole grant hearings at which predicted terms of incarceration are determined, fundamental principles of due process under article I, section 7 of the Utah Constitution apply.

■ We understand that by acknowledging in *Foote* that the parole function is a complex, multi-dimensional proceeding which includes sentencing, we have opened the door to a more extensive review of the constitutional adequacy of procedures that the Board, and probably the legislature, would prefer to exclude from such review. As indicated in this opinion, however, we regard that conclusion as inescapable. Because

Utah has designed a penal system in which the Board of Pardons rather than the courts actually decides how much time convicted persons spend in prison, the Board, like the courts, is governed by constitutional requirements addressing accuracy and fairness in the decision-making process. Accordingly, the Board is directed to afford petitioner and all similarly situated inmates timely disclosure of the contents of their files (or reasonable summaries thereof) prior to conducting original parole grant hearings.

We emphasize once again that this opinion applies only to original parole release hearings and addresses only those procedures specifically requested by this petitioner. The extent to which additional due process protections must be afforded inmates in this and other proceedings in the parole system will require case-by-case review. "Due process is flexible and calls for the procedural protections that the given situation demands." *In re Whitesel*, 763 P.2d at 203. The Board of Pardons is of course the appropriate body to make the first assessment of those demands, and we anticipate that it will do so.[7]

■ Finally, because we anticipate that today's decision may create some uncertainty as to the scope of its application, we address the issue of retroactivity. The question before us is whether the rule announced today must be applied retroactively to cases in which a criminal offender has already had an original parole grant hearing. In essence, does this opinion require the Board to reopen criminal cases and parole decisions that were final?

To begin, it is important to note the unique nature of appellate review of original parole grant determinations. This uniqueness stems from the hybrid nature of challenges to these decisions. On one hand, inmates may seek review of board determinations only through extraordinary writs, and such proceedings are deemed civil in nature.[8] On

---

7. We further note that there are circumstances where the Board will need to examine reliable hearsay in disciplinary proceedings to protect the safety and even the lives of inmates and guards. We do not expect that such procedures would violate due process.

8. Utah Code Ann. § 77–27–5(3) bars criminal offenders from obtaining judicial review of Board determinations and decisions in cases involving approval or denial of parole. However, we recently recognized that article I, sections 7 and 11 of the Utah Constitution permit review, via an extraordinary writ, of such Board actions.

the other hand, whether due process applies in original parole grant hearings is essentially a question of criminal procedure. Thus, although the method of attack is civil, the underlying substantive question is criminal. Our opinion in *Andrews v. Morris,* 677 P.2d 81 (Utah 1983), provides a useful analytic framework for determining retroactivity in this unique context.

   ■  In *Andrews,* 677 P.2d at 91, this court thoroughly examined and then adopted a three-pronged retroactivity test. We stated:

   [W]e hereby explicitly adopt the following analytic standards for determining the retroactivity of new rules in criminal cases on collateral rather than direct review: 1) the purpose to be served by the new rule; 2) the extent of reliance on the old rule, and 3) the effect on the administration of justice of a retroactive application of the new rule.

677 P.2d at 91.[9] Given that inmates may challenge Board actions only through extraordinary writs, this balancing test presents an excellent framework for addressing the question before us.

   Applying this three-part balancing test to the instant case reveals strong considerations against retroactive application. Thus, we hold that the Board must incorporate the due process standards we have announced today into all original parole grant hearings occurring on or after the date of this opinion.

   As we have discussed, the primary purpose of the procedural safeguards announced today is to ensure the accuracy and fairness of Board decisions in original parole grant hearings. This purpose is essentially prophylactic. As in *Andrews,* we find the United States Supreme Court's analysis in *Michigan v. Payne,* 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973), to be particularly instructive on the retroactivity of new prophylactic constitutional rules. *See Andrews,* 677 P.2d at 91–92.

   *Payne* dealt with the retroactive effect of a new procedural rule announced in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In an effort to prevent vindictiveness from factoring into resentencing, the *Pearce* Court established certain due process safeguards for defendants who had successfully challenged their original convictions, had been retried and reconvicted, and were awaiting resentencing. Although the United States Supreme Court had yet to speak on the retroactive effect of *Pearce,* the Michigan Supreme Court, having found vindictiveness in resentencing, granted Payne the benefit of *Pearce. Payne,* 412 U.S. at 48–49, 93 S.Ct. at 1967. The State appealed, and the United States Supreme Court granted certiorari.

   In addressing the first prong of the test, the *Payne* Court recognized that "[i]t is an inherent attribute of prophylactic constitutional rules ... that their retrospective application will occasion windfall benefits for some defendants who have suffered no constitutional deprivation." 412 U.S. at 53, 93 S.Ct. at 1970. Thus, applying *Pearce* retroactively "would require the repudiation of many sentences rendered under circumstances in which there was no genuine possibility that vindictiveness played a role." *Id.* at 53–54, 93 S.Ct. at 1970. The Court concluded, "Absent countervailing considerations rooted in the purposes underlying a new rule, this

---

*Foote v. Utah Bd. of Pardons,* 808 P.2d 734, 735 (Utah 1991).

**9.** We note the inconsistent nature of federal retroactivity law and the overruling of the United States Supreme Court decisions we cited with approval in *Andrews v. Morris,* 677 P.2d 81, 88–91 (Utah 1983). *See Harper v. Virginia Dep't of Taxation,* —— U.S. ——, ——, ——, 113 S.Ct. 2510, 2516, 2518, 125 L.Ed.2d 74, 85, 88 (1993) (noting that *Linkletter v. Walker,* 381 U.S. 618, 85 ·S.Ct. 1731, 14 L.Ed.2d 601 (1965), and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), were overruled by *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). However, the continued vitality of these decisions is irrelevant to our state law analysis. As the *Harper* Court recognized, state courts are free "to limit the retroactive operation of their own interpretations of state law." —— U.S. at ——, 113 S.Ct. at 2519, 125 L.Ed.2d at 88 (citing *Great Northern Ry. v. Sunburst Oil & Ref. Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932)). Moreover, as we noted in *Andrews,* "[W]e view the federal precedent as instructive but not binding except insofar as we explicitly incorporate them into our own law on retroactivity." 677 P.2d at 88. We reaffirm that principle here.

factor—that retroactive application of such broadly protective rules would occasion reversals in many instances in which no actual prejudice has been suffered—points toward a ruling of prospectivity." *Id.* 677 P.2d at 92.

Retroactive application of the rule we announce today might require the Board to reopen the original parole grant hearings of every inmate and parolee currently under the Board's authority. This would force the Board to rehear proceedings which did not offend due process and resulted in entirely fair and accurate parole determinations. We are convinced that the vast majority of prior original parole determination hearings fall into this category. As in *Payne*, this factor—requiring the Board to reopen original parole grant hearings which were both accurate and fair—points toward a ruling of prospectivity.

■ The *Payne* Court also identified a second factor helpful in determining whether the purpose of a new rule favors retroactive or prospective application. Nonretroactivity is proper when a new rule "create[s] a protective umbrella serving to enhance a constitutional guarantee, [rather than] confer[ring] a constitutional right that had not existed prior to [the] decision[ ]." 412 U.S. at 54, 93 S.Ct. at 1970. The Court found that *Pearce*'s vindictiveness prohibition constituted a "protective umbrella" rather than a new constitutional right because "the right to be free from fundamentally unfair sentencing considerations predated *Pearce.* [Moreover, b]ecause these foundational rights remain available to defendants in ... pre-*Pearce* cases, a decision of nonretroactivity is less likely to result in the continued incarceration of those whose convictions or sentences rest on unconstitutional acts." *Id.* (citations omitted).

Similarly, the due process safeguards announced today are precisely that—safeguards. We do not confer a new constitutional right, but rather create a protective umbrella to enhance inmates' existing constitutional rights to due process. As in *Payne*, a decision of nonretroactivity does not foreclose collateral suits by inmates who can show some evidence that the Board violated their rights to due process in their original

parole grant hearing. However, an inmate who has already had an original parole grant hearing may not use the specific due process standards we announce today to make that evidentiary showing. *See Payne*, 412 U.S. at 54–55, 93 S.Ct. at 1970.

Based on the above analysis, we conclude that the prophylactic purpose of the rule announced in this case will best be served through solely prospective application. We now turn to the second and third prongs of the *Andrews* test, the extent of reliance on the old rule and the effect on the administration of justice if the new rule is applied retroactively.

Clearly, the Board has relied quite heavily, perhaps exclusively, on the long-standing procedural standard of discretionary notice and disclosure. Prior to *Foote v. Utah Board of Pardons*, 808 P.2d 734 (Utah 1991), the view that an original parole grant hearing is analogous to criminal sentencing and requires certain procedural safeguards was not reflected in our decisions. *Foote*, along with this opinion, has significantly altered acceptable procedure at original parole grant hearings.

However, prior to *Foote*, the Board acted in adherence with then-current law and cannot be faulted. To now declare invalid each original parole decision held in accordance with past law would work a fundamental injustice on the Board, the judiciary, and the citizens of this state. Thus, the Board's extensive and justifiable reliance on the old procedural standards favors nonretroactivity.

The final *Andrews* factor also cuts strongly in favor of nonretroactivity. If today's decision were retroactively applied, the Board would be required to reopen the original parole grant hearings of each inmate or parolee under its authority. The backlog produced by this situation could dramatically impair the functioning of the Board and perhaps the entire prison system. Such a serious interference with the system of criminal justice would be untenable.

Accordingly, we hold that the due process safeguards identified today apply only in those original parole grant hearings occurring on or after the date of this decision.

However, considerations of judicial integrity require us to extend the benefit of our decision to petitioner and to any inmate who currently has a claim pending in the district court or on appeal before this court or the court of appeals challenging original parole grant hearing procedures on due process grounds.

Remanded for disclosure and a new hearing before the Board.

---

HALL, C.J., HOWE, Associate, C.J., and STEWART and ZIMMERMAN, JJ., concur.