2004 UT 53

**Scott Allen JONES, Plaintiff, Appellee, and Cross–Appellant,**

v.

**UTAH BOARD OF PARDONS & PA-ROLE, and Hank Galetka, Warden of the Utah State Prison Defendants, Appellants, and Cross–Appellees.**

No. 20020485.

Supreme Court of Utah.

June 29, 2004.

Edward K. Brass, Salt Lake City, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Sharel S. Reber, Asst. Att'y Gen., Salt Lake City, for defendants.

NEHRING, Justice:

¶ 1 This case presents the question of whether the Utah Constitution authorized the legislature to enact Utah Code section 77–27–11(3), which empowers the Board of Pardons and Parole to issue warrants to retake parolees believed to have violated parole. Utah Code Ann. § 77–27–11(3) (2003). We hold that it did.

## BACKGROUND

¶ 2 Scott Jones is now incarcerated at the Utah State Prison. He had been previously committed to prison following a conviction for theft of an automobile and was paroled in June 1995. When he was paroled, Mr. Jones signed a parole agreement that required him to comply with numerous conditions, including that he complete a program at a community correctional center and that he not abscond from parole supervision.

¶ 3 Two days after his release, Mr. Jones absconded from the correctional center. Acting under the authority of Utah Code section 77–27–11(3), a member of the Board

of Pardons and Parole issued a warrant to retake Mr. Jones on the basis that he had violated his parole (the "retaking warrant"). *See* Utah Code Ann. § 77–27–11(3) (2003). Mr. Jones was taken into custody and returned to prison in September 1995. He admitted that he violated his parole. While at large, Mr. Jones had committed aggravated robbery. He was convicted and sentenced to prison for this offense in June 1996.

¶ 4 In November 1996, the Board conducted a hearing and revoked Mr. Jones' parole. It based its revocation on both Mr. Jones' guilty plea to a parole violation and his conviction for aggravated robbery.

¶ 5 Appearing pro se, Mr. Jones filed a petition for extraordinary relief in August 1999, seeking to be released from prison. In his lengthy petition, Mr. Jones mounted broad and diffuse attacks on the constitutional authority of the Board to revoke his parole, as well as the conduct of both the district attorney who prosecuted him and the public defender appointed to represent him. The trial court appointed counsel to represent Mr. Jones with respect to this petition.

¶ 6 Both the Board and Mr. Jones filed dispositive motions, which pruned Mr. Jones' claims into the form in which they are now presented to us. His claims centered around his challenge to the Board's authority to issue the warrant that resulted in his post-absconsion apprehension. Mr. Jones contended that, when the Board issued this retaking warrant, it exercised a "core judicial function" that can be lawfully performed only by a member of the judicial branch of government. He further argued that the issuance of the retaking warrant violated article V, section 1 of the Utah Constitution, which mandates the separation of governmental powers among the executive, legislative, and judicial departments. Utah Const. art. V, § 1.

¶ 7 In a memorandum decision issued in November 2001, the trial court agreed with Mr. Jones' contentions and issued an order permanently enjoining the Board and its members from issuing retaking warrants. The trial court stayed the order pending resolution of the Board's appeal. We reverse the ruling of the trial court and remand.

## ISSUES AND STANDARD OF REVIEW

¶ 8 The major portion of our analysis is directed toward Mr. Jones' contentions that section 77–27–11(3) is unconstitutional, both because it enables the Board to exercise a "core judicial function" and because it violates the principle of separation of powers. We also take up two subsidiary questions raised in the trial court's memorandum decision: whether section 77–27–11(3) unconstitutionally allows a single Board member to issue a retaking warrant, in violation of article VII, section 12 of the Utah Constitution, which requires the Board to act as a majority; and whether section 77–27–11(3) violates the Fourth Amendment of the United States Constitution and article I, section 14 of the Utah Constitution, both of which prohibit unreasonable searches and seizures, because it allows for a retaking arrest without probable cause.

¶ 9 The four issues presented on appeal call on us to undertake statutory and constitutional interpretation. This is a task we perform without deference to the trial court's determinations. *Utah Safe to Learn–Safe to Worship Coalition, Inc. v. State*, 2004 UT 32, ¶ 10, 94 P.3d 217.

¶ 10 We presume that the statute is constitutional and, therefore, that the warrant it authorized was proper. " '[S]tatutes are presumed to be constitutional until the contrary is clearly shown. It is only when statutes manifestly infringe upon some constitutional provision that they can be declared void. Every reasonable presumption must be indulged in and every reasonable doubt resolved in favor of constitutionality.' " *Salt Lake City v. Ohms*, 881 P.2d 844, 847 (Utah 1994) (quoting *In re Estate of Baer*, 562 P.2d 614, 616 (Utah 1977)). Thus, the party challenging a statute's constitutionality bears a heavy burden of proving its invalidity. *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 637 (Utah 1989).

¶ 11 Finally, Mr. Jones cross-appeals, asking us to review the trial court's denial of his demand for an evidentiary hearing on his claim that his guilty plea and admissions to

parole violations were the product of his illegal arrest.

## ANALYSIS

### I. ISSUES ON APPEAL

¶ 12 The statute that Mr. Jones contests, and that the trial court found to be constitutionally infirm, states:

> Any member of the board may issue a warrant based upon a certified warrant request to a peace officer or other persons authorized to arrest, detain, and return to actual custody a parolee, and may upon arrest or otherwise direct the Department of Corrections to determine if there is probable cause to believe that the parolee has violated the conditions of his parole.

Utah Code Ann. § 77–27–11(3) (2003).

### A. The Core Judicial Function Challenge

¶ 13 The trial court anchored its holding that section 77–27–11(3) was unconstitutional on the conclusion that the Board's power to issue a retaking warrant was a "core judicial function," and thus could be performed only by a judicial officer who was appointed pursuant to article VIII of the Utah Constitution. As authority for this conclusion, the trial court relied largely on *State v. Thomas*, 961 P.2d 299 (Utah 1998). In that case, we held that the power of a court of record to issue a search warrant was a "core judicial function" that could not be exercised by court commissioners because they are not judicial officers appointed pursuant to article VIII of the Utah Constitution. *Id.* at 302.

¶ 14 *Thomas* was based largely on a previous case, *Salt Lake City v. Ohms*, in which we first used the nomenclature "core judicial function." *Salt Lake City v. Ohms*, 881 P.2d 844, 848 (Utah 1994). In *Ohms*, we held that court commissioners in courts of record did not have the power to enter final judgments and to impose sentences on defendants in criminal misdemeanor cases. *Id.* at 851. We characterized that power as a "core judicial function" and held that, in courts of record, only judicial officers appointed pursuant to article VIII could exercise it. *Id.*

¶ 15 The trial court in this case reasoned that the Board is analogous to the court commissioners in *Ohms* and *Thomas* because neither enjoy status as an article VIII judicial power. The trial court also found similarity between the power of a retaking warrant to arrest a suspected parole violator, and the power of a search warrant to search a citizen's dwelling, and concluded that a retaking warrant, like a search warrant, is a "core judicial function." We depart from both elements of the trial court's analysis.

¶ 16 The trial court overextended the reach of *Ohms* and *Thomas*. It is true that the members of the Board, like court commissioners, do not acquire or maintain their positions pursuant to the judicial selection and retention process set out in article VIII. However, Board members, unlike commissioners, do not serve in "courts of record," a characteristic that defined the realm of both *Ohms* and *Thomas*.

¶ 17 The statutory grant of authority to court commissioners exceeds constitutional limits " 'to the extent that it purports to vest ultimate judicial power in courts of record in persons who have not been duly appointed as article VIII judges.' " *Thomas*, 961 P.2d at 302 (quoting *Ohms*, 881 P.2d at 855). Thus, because the Board is not a court of record, *Ohms* and *Thomas* do not apply to warrants which it issues.[1]

¶ 18 The trial court also overstated the similarity between a retaking warrant and a search warrant. When we held that the issuance of a search warrant was a "core judicial function," we noted that search war-

---

1. Similar examples can also be found in other areas of the government. In practice, enforceable judgments are routinely entered by justice court judges and volunteer judges pro tempore who preside in many small claims courts. Like article VIII judges, these judges exercise the judicial power of courts, a power which we have defined as " 'the power to hear and determine controversies between adverse parties and questions in litigation.' " *Ohms*, 881 P.2d at 849 (quoting *Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984)). Like commissioners and members of the Board, these judges are not subject to article VIII's selection and retention requirements, but only commissioners are assigned to courts of record and are there-

rants implicate a right preeminent among those protected by our constitution. *Id.* at 303. We need not retreat from our recognition of the importance of the right to be free from unreasonable searches, or our commitment to defend it, to conclude that retaking warrants, issued to apprehend absconding parolees, are not entitled to equal dignity.

¶ 19 When Mr. Jones was sentenced to serve a prison commitment, he was placed in the custody of the Department of Corrections.[2] *See* Utah Code Ann. § 64–13–7 (2003). The Department's custodial responsibilities extend to offenders who, like Mr. Jones, are paroled. *Id.* Although parolees are entitled to a greater range of constitutional protections than prison inmates, they do not enjoy the full complement of constitutional freedoms. *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). " 'Revocation [of parole] deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions.' " *Gagnon v. Scarpelli*, 411 U.S. 778, 781, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (quoting *Morrissey*, 408 U.S. at 480, 92 S.Ct. 2593).

¶ 20 We have previously stated that " 'the parole function is a complex, multidimensional proceeding.' " *Padilla v. Bd. of Pardons & Parole*, 947 P.2d 664, 669 (Utah 1997) (quoting *Labrum v. Bd. of Pardons*, 870 P.2d 902, 911 (Utah 1993)). Within the dimensions of the parole function is the need to impose and enforce conditions of parole. The ability to issue retaking warrants, and thus engage the aid of law enforcement in apprehending offenders who violate the conditions of parole, is integral to the effective use of parole as an alternative to incarceration. We therefore conclude that the constitutional interest at stake in the issuance of retaking warrants does not merit including them in the category of a "core judicial function."

*B. The Separation of Powers Challenge*

¶ 21 Because our "core judicial function" jurisprudence is, in its present form,

limited to courts of record, it does not provide an analytical model to evaluate generally claims that a legislative grant of power violates the separation of powers clause of the Utah Constitution. Thus, although considerable overlap exists between the considerations relevant to both "core judicial function" claims and separation of powers challenges, we take up separately Mr. Jones' separation of powers claim.

¶ 22 Article V, section 1 of the Utah Constitution divides the power of the government into three branches:

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of the powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

Utah Const. art. V, § 1.

¶ 23 To determine whether section 77–27–11(3) violates this provision, we apply an analytical model that poses three questions:

> First, are the [actors] in question "charged with the exercise of powers properly belonging to" one of the three branches of government? Second, is the function that the statute has given the [actors] one "appertaining to" another branch of government? The third and final step in the analysis asks: if the answer to both of the above questions is "yes," does the constitution "expressly" direct or permit exercise of the otherwise forbidden function? If not, article V, section 1 is transgressed.

*In re Young*, 1999 UT 6, ¶ 8, 976 P.2d 581 (quoting Utah Const. art. V, § 1).

¶ 24 We first assay whether the Board is a "person charged with the exercise of powers properly belonging to" one of the three branches of government. *Id.* The trial court read our holdings in *Robinson v. State*, 2001 UT 21, 20 P.3d 396, and *State v. Gallion*, 572 P.2d 683 (Utah 1977), to mean that the

---

fore ineligible to perform "core judicial functions" under *Ohms* and *Thomas*.

**2.** The Board has authority to commute or terminate the sentence, including release on parole, of

any offender under the jurisdiction of the Department of Corrections. Utah Code Ann. § 77–27–9 (2003).

Board, because it is not one of the five elective constitutional officers of the executive department, is not a "person" for purposes of this provision, but is instead more like an "administrative agency." We disagree with this reading of *Robinson* and *Gallion* and begin the analysis anew.

¶ 25 In *Robinson,* we held that the Utah Department of Transportation was not part of the executive branch for purposes of article V. We wrote:

The constitution itself defines those "persons" who are deemed to be a part of the Executive Department, and that definition does not include administrative agencies.... "Although administrative bodies are nominally designated a part of the executive branch, they do not fall *within the Constitutional definition of the Executive Department* and the prohibition of [A]rticle V, section I does not apply thereto."

*Id.* at ¶ 12 (emphasis added) (quoting *Gallion,* 572 P.2d at 687).

¶ 26 We maintain the position that "person," as it is used in article V, section 1, does not encompass "administrative agencies." However, this is not a case about an administrative agency. Rather, the Board falls squarely—not nominally—"within the Constitutional definition of the Executive Department." Its genesis is not as an entity created by the governor to help with her administrative duties; rather, it is created in article VII, the article that sets forth the executive department: "There is created a Board of Pardons and Parole. The Governor shall appoint the members of the board with the consent of the Senate. The terms of office shall be as provided by statute." Utah Const. art. VII, § 12(1).

¶ 27 The legislature has twice amended the constitutional provisions regarding the Board, and, in so doing, has preserved the Board's place in the executive department. We interpret the Board's position in article VII as a positive indicator that the legislature intends it to be there. We do not think this conclusion is contradicted by the fact that article VII, section 1 states that the "elective constitutional officers" of the executive department are the governor, lieutenant governor, state auditor, state treasurer, and attorney general. Utah Const. art. VII, § 1(1). Although the Board clearly is not an elective constitutional officer, this language does not dislodge the Board's position in the executive department, and leads us to conclude that the provision complies with article V, section 1.

¶ 28 Second, we ask whether the function of issuing retaking warrants is one "appertaining to" another branch of government— in this case, the judicial branch. In part A of this opinion, we determined that the issuance of a retaking warrant was not a core judicial function. Although a governmental activity need not be a core judicial function to "appertain to" the judicial branch, we need not determine whether retaking warrants appertain to the judicial branch because, appertaining or not, they are expressly permitted by the constitution.

¶ 29 The third *Young* query is whether the Utah Constitution expressly directs or permits the Board to issue a retaking warrant as provided by section 77–27–11(3). Article V, section 1 allows for an exception to the otherwise absolute separation of powers. Utah Const. art. V, § 1. Such an exception makes sense in light of the practical realities of governmental activities. "The separation-of-powers doctrine ... has no rigid boundaries. Instead, some acts can be properly entrusted to more than one branch of government, and some functions inevitably intersect.... [H]armonious cooperation among the three branches of government [is] fundamental to our system of government." *Klouda v. Sixth Judicial Dist. Dep't of Corr. Servs.,* 642 N.W.2d 255, 260 (Iowa 2002) (internal quotations omitted).

¶ 30 The exception to an absolute separation of powers is also consistent with the historical underpinnings of the Board's constitutional creation. When enacted, the Board was created by a constitutional provision that stated:

Until otherwise provided by law, the Governor, Justices of the Supreme Court and Attorney–General shall constitute a Board of Pardons, a majority of whom, including the Governor, upon such conditions, and

with such limitations and restrictions as they deem proper, may remit fines and forfeitures, commute punishments, and grant pardons after convictions, in all cases except treason and impeachments, subject to such regulations as may be provided by law, relative to the manner of applying for pardons.

Utah Const. of 1896, art. VII, § 12. Under this framework, the Board was uniquely positioned: it had inter-branch membership, being comprised of representatives of both the executive and judicial branches, and was authorized to perform its functions "with such limitations and restrictions as [it] deem[s] proper." *Id.*

¶ 31 However, in response to a belief that the reach of the Board's power was too broad, the constitution was amended to provide legislative oversight of the Board's activities. We have previously summarized the development of this constitutional provision:

> Prior to its amendment in 1980, Article VII, section 12 allowed the Board of Pardons to grant parole upon such conditions, and with such limitations and restrictions as they [i.e., the members of the Board] deem proper. Because of the breadth of this power, pre–1980 decisions of this Court can be read as treating the Board of Pardons as, in effect, a fourth branch of government.
>
> However, in 1980, an amendment to Article VII, section 12 narrowed the power of the Board of Pardons by striking the above-quoted language and substituting language which made the Board's power to grant parole subject to such conditions as may be established by the Legislature.

*State v. Bishop,* 717 P.2d 261, 264 (Utah 1986) (internal quotations and citations omitted).

¶ 32 The 1980 version read:

> Until otherwise provided by law, the Governor, Justices of the Supreme Court and Attorney General shall constitute a Board of Pardons, a majority of whom, including the Governor, upon such conditions as may be established by the Legislature, may remit fines and forfeitures, commute punishments, and grant pardons after convictions.

Utah Const. of 1980, art. VII, § 12. With the amendment's injection of legislative oversight, the Board acquired as its constituent elements contributions from all three branches of government: it was composed of members of both the executive and judicial branches, and its power was subject to conditions established by the legislature.

¶ 33 In 1992, the constitutional authority of the Board of Pardons was again amended to its current language. This provision changed the membership of the Board, removing from it the governor, justices of the supreme court, and the attorney general. The new provision also more clearly articulated the role of the Board and, for the first time, included the power to parole among its express duties. The current provision reads, in relevant part:

> (1) There is created a Board of Pardons and Parole. The Governor shall appoint the members of the board with the consent of the Senate. The terms of office shall be as provided by statute.
>
> (2) (a) The Board of Pardons and Parole, by majority vote and upon other conditions as provided by statute, may grant parole, remit fines, forfeitures and restitution orders, commute punishments, and grant pardons after convictions, in all cases except treason and impeachments, subject to regulations as provided by statute.

Utah Const. art. VII, § 12. The history of the Board thus demonstrates the "harmonious cooperation" and "inevitable intersection" so fundamental to smooth operation of the government.

¶ 34 We turn, then, to the question of whether the constitution "expressly direct[s] or permit[s]" the Board to issue a retaking warrant, as set forth in section 77–27–11(3). We hold that it does. The current constitutional provision enumerates certain powers of the Board: namely, to grant parole, remit fines, forfeitures, and restitution orders, commute punishments, and grant pardons. Mr. Jones' argument that the issuance of a retaking warrant is an unconstitutional violation of the separation of powers assumes that the authority to issue such a warrant is not in-

cluded within any of these powers. Such an argument would be plausible if we required that, in order to be "expressly directed or permitted," each and every task of the Board must be articulated in the constitution.

¶ 35 As we have demonstrated in our "core judicial function" discussion of the Board's scope of authority over parolees, the Board's power to issue retaking warrants falls well within the ambit of its legitimate plenary powers to "grant parole." Necessarily enveloped in the power to "grant parole" is the authority to administer and supervise parole, revoking it as needed.

¶ 36 Accordingly, we hold that the Board's statutory authority to issue a retaking warrant is an integral part of its authority to grant pardons. Because the authority to grant pardons is "expressly directed or permitted" by article VII, section 12(2)(a), it is not a violation of the otherwise absolute separation of powers found in article V, section 1.

### C. "Majority" v. "Individual"

■■ ¶ 37 The trial court, on its own initiative, stated in a footnote that section 77–27–11(3) may violate article VII, section 12, the Utah Constitutional provision that establishes the Board, because it allows "any member of the board" to issue retaking warrants. The trial court found this statute to conflict with the constitutional mandate that the Board "by majority vote and upon other conditions as provided by statute, may grant parole … subject to regulations as provided by statute." Utah Const. art. VII, § 12, cl. 2(a) (emphasis added). The trial court concluded that an individual board member does thus not have the legal authority to issue a retaking warrant without the majority vote required by article VII, section 12.

¶ 38 We find this to overly expand the range of Board activities requiring full Board participation. The purpose for requiring a "majority vote" in matters of granting parole, remitting fines, forfeitures and restitution orders, commuting punishments, and granting pardons is to ensure that a prisoner is afforded his full measure of due process. This is more clearly articulated in the next provision of the constitution, which states:

A fine, forfeiture, or restitution order may not be remitted and a commutation, parole, or pardon may not be granted except after a full hearing before the board, in open session, and after previous notice of the time and place of the hearing has been given.

Utah Const. art. VII, § 12, cl. 2(b).

¶ 39 To insist that "by majority vote and upon other conditions as provided by statute" means that every decision made by the Board must be approved by a majority is to ignore the fact that the same rigor of process is not due each of those decisions. A more practical and logical reading suggests that some tasks, those more ministerial in nature than the grant or revocation of parole, can be performed by one individual. At oral argument, Mr. Jones' counsel stated that such retaking warrants are issued "five or six" times a day. With such a high frequency, a majority vote on each warrant would be an administrative clog to the system that greatly outweighed any benefit to the due process of the parolees in question.

■■ ¶ 40 While the issuance of a retaking warrant is not as ministerial as, for example, filling out forms, it is clearly less demanding of due process safeguards than granting or revoking parole. The purpose of a retaking warrant is not to grant or deny rights to a parolee; rather, its practical purpose is to initiate the process of revoking parole, a duty which mandates a majority action.

¶ 41 This view is also consistent with the constitutional history of this provision. We do not suppose that, when the Board was comprised of its original membership, the governor, the attorney general, and the justices of the supreme court, a majority vote by these individuals was required before any of the Board's powers could be invoked. Instead, a majority vote was more likely meant for activities that involve the most important rights of a prisoner—such as the granting or revoking of parole, extending pardons, and the like.

¶ 42 We are also led to this conclusion by the twice-mentioned authority of the legislature to shape the operations of the Board.

Where the constitution has so clearly delegated to the legislature the authority to prescribe the detailed operations of the Board, we will not exercise our authority to declare its directives unconstitutional. Accordingly, we do not hold that section 77–27–11(3) is in constitutional conflict with its own progenitor, article VII, section 12.

### D. Probable Cause

¶ 43 The trial court also suggested that section 77–27–11(3) might unconstitutionally allow a parolee's arrest without probable cause in violation of the Fourth Amendment of the United States Constitution and article I, section 14 of the Utah Constitution, which prohibit unreasonable searches and seizures.[3] The court wrote that section 77–27–11(3), although it states the warrant-issuing Board "may . . . direct the Department of Corrections to determine if there is probable cause to believe that the parolee has violated the conditions of his parole," does not demand a finding of probable cause prior to retaking. However, this argument fails because it would impose requirements on section 77–27–11(3) that are not required by either the United States Constitution or the Utah Constitution.

¶ 44 First, we must consider section 77–27–11(3) in context with its surrounding sections.[4] Section 77–27–11(4) states that "[u]pon a finding of probable cause, a parolee may be further detained or imprisoned again pending a hearing by the board or its appointed examiner." Utah Code Ann. § 77–27–11(4) (2003). Thus, although section 77–27–11(3) does not demand an immediate determination of probable cause, section 77–27–11(4) ensures that a determination of proba-

ble cause will be made before the parolee is further detained or imprisoned.

¶ 45 Although this would not meet the requirements of due process for an ordinary citizen, this requirement is sufficient in the case of a parolee. It is well-established that a parolee has a more limited right to due process than other citizens. In recognition of this limited interest, the United States Supreme Court has defined the appropriate test thus:

> [W]hen [a] parolee is arrested and detained, usually at the direction of his parole officer, . . . due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available. Such an inquiry should be seen as in the nature of a "preliminary hearing" to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions.

*Morrissey,* 408 U.S. at 485, 92 S.Ct. 2593 (citations omitted).

¶ 46 We have no doubt that where a warrant-issuing Board member may ask the Department of Corrections to determine if there is probable cause to detain a parolee, and probable cause must be found in order to further detain the parolee, the "minimal inquiry" requirements of due process of both the Utah and the United States Constitutions are met.

---

3. This issue, like the issue discussed in part C of this opinion, was raised for the first time by the trial court in a footnote. It was not raised at trial, nor was a factual record developed on this matter. There is no indication that probable cause did not exist to retake Mr. Jones; to the contrary, in addition to whatever parole violations he may have committed, he also committed aggravated robbery while on parole.

4. We note, as an initial matter, that although the statute does not explicitly require probable cause, the administrative rules governing the issuance of a warrant do:

> Warrants shall be issued only upon a showing that there is probable cause to believe that a parole violation has occurred. A certified Warrant Request shall be submitted by the parole agent setting forth reasons to believe that the named parolee committed specific parole violations. The request may be accompanied by supporting documentation such as police reports, incident reports, and judgment and commitment orders. Upon approval of the request by the Board, a Warrant of Arrest shall be issued to arrest, detain, and return to actual custody the parolee named therein.
> Utah Admin. Code R671–510–1 (2003).

### E. Mr. Jones' Cross–Appeal

¶ 47 Finally, Mr. Jones asks us to review the decision of the trial court to deny him an evidentiary hearing on his claim that his guilty plea and admissions to parole violations were the products of his illegal arrest following a warrant issued by the Board. This issue is rendered moot by our holding that the retaking warrant which resulted in Mr. Jones' apprehension was constitutional, and thus, that his arrest was not illegal.

## CONCLUSION

¶ 48 We reverse the decision of the trial court that Utah Code section 77–27–11(3) is unconstitutional, and remand for actions consistent with this opinion.

¶ 49 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Judge HEFFERNAN concur in Justice NEHRING'S opinion.

¶ 50 Having disqualified himself, Justice DURRANT does not participate herein; District Judge PAMELA G. HEFFERNAN sat.

2004 UT 54

**FAIRBOURN COMMERCIAL, INC., a Utah corporation, Plaintiff and Respondent,**

v.

**AMERICAN HOUSING PARTNERS, INC., a Delaware corporation, Defendant and Petitioner.**

No. 20030377.

Supreme Court of Utah.

July 2, 2004.

Neil R. Sabin, Salt Lake City, for plaintiff.

Dennis K. Poole, John L. Adams, Salt Lake City, for defendant.

WILKINS, Associate Chief Justice:

¶ 1 Defendant American Housing Partners, Inc. challenges the court of appeals' decision affirming the trial court's judgment in favor of plaintiff Fairbourn Commercial, Inc., which awarded Fairbourn a real estate commission of $153,000 for American's breach of a single party listing and sale agreement. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 In August 1999, American, an experienced real estate developer, entered into a single party listing and sale agreement with Fairbourn, a real estate brokerage, for the sale of ninety-nine undeveloped lots located in West Jordan (the "property"). The listing agreement identified the prospective buyer as Rochelle Properties, LC. According to the listing agreement, if Fairbourn procured an offer from Rochelle, and if American accepted the terms of the offer, American would pay Fairbourn a commission of $1,500 per lot. The agreement also stipulated that "[all commissions] shall be due and payable at closing." In addition, the agreement specified a sale price of $2,277,000 for the property.

¶ 3 After some negotiation, Rochelle and American eventually agreed to terms for the sale of the property. One clause of the purchase contract between Rochelle and American required Rochelle to demonstrate "financial capability to close" on the sale of the property within fourteen days from execution of the purchase contract. Pursuant to this clause, Rochelle submitted two different letters from First Security Bank attesting to Rochelle's financial capability. However, American rejected the bank's assurances and cancelled the contract without further explanation. American later sold the property to another buyer at a higher price and did not pay a commission to Fairbourn for procuring an offer from Rochelle.

¶ 4 Fairbourn sued American to recover the commission to which it believed it was entitled. The trial court found that American breached the listing agreement and awarded Fairbourn its commission plus attorney fees and costs. American appealed, challenging the trial court's determination that the terms of the purchase contract were ambiguous, the court's taking of extrinsic evidence, and its factual findings based on the evidence submitted. *Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.*, 2003 UT App 98, ¶ 14, 68 P.3d 1038. American also argued that the listing agreement did not entitle Fairbourn to a commission until the closing of the Rochelle sale, which

never occurred. The court of appeals disagreed with American on this point and affirmed the trial court's judgment. It concluded that the listing agreement entitled Fairbourn to a commission when American accepted an offer from Rochelle and further noted that the existence of "due and payable at closing" language generally does not create a condition precedent to receipt of a commission. The court of appeals' decision on this ground dispensed with its need to consider American's other arguments on appeal.