Associate Chief Justice Lee, dissenting:
 

 ¶ 120 I share some of the majority's concerns about the fairness of the procedures afforded to Neese by the Parole Board. The Board's refusal to allow Neese to call and question his accuser made it difficult for him to persuasively refute the sex-offense charge against him. And without a persuasive means of rebuttal, Neese is likely to face substantially more prison time than most other inmates serving time for his crime of conviction (obstruction of justice). He would also serve that time without a trial-like adjudication of the sex-offense charge in question.
 

 ¶ 121 For these and other reasons I might endorse the procedures set forth in the majority opinion if I were in a position to make policy in this field-to promulgate administrative rules governing the Parole Board. I hedge-saying only that
 
 I might
 
 -because I am certain that my understanding of the Board's decisionmaking process is incomplete. And I frame this conclusion in the subjunctive-speaking of what I might do
 
 if I were
 
 in a position to promulgate rules for the Board-to underscore the limited scope of our authority in a case like this one. In deciding this case we are deciding only on the demands of the Utah constitution. We are not deciding what set of procedural rules strike us as ideal under these circumstances.
 

 ¶ 122 The line between those two concepts is too often blurred in modern judicial thinking. And the blurriness is perhaps at its height when we speak of the requirements of "due process." Here, perhaps more than in other constitutional fields, it is tempting to think of the constitutional requirement of due process as a general charter for assuring a vague ideal of fairness-an ideal that will ebb and flow or evolve over time. But that is not what is enshrined in the due process clause. "[T]he Due Process Clause is not a free-wheeling constitutional license for courts to assure fairness on a case-by-case basis."
 
 In re Discipline of Steffensen
 
 ,
 
 2016 UT 18
 
 , ¶ 7,
 
 373 P.3d 186
 
 . "[I]t is a constitutional standard" with a specific, if somewhat flexible, meaning.
 
 Id
 
 .
 

 ¶ 123 The idea of a fixed construct is inherent in the very nature of constitutional law. The whole point of having a written constitution is to "establish the fundamental ground rules for lawmaking"-the "fixed bulwarks" we deem essential to protect us against "tyrannies of the majority."
 
 State v. Houston
 
 ,
 
 2015 UT 40
 
 , ¶ 149,
 
 353 P.3d 55
 
 (Lee, A.C.J., concurring in part and concurring in judgment) (citation omitted). Without those "fixed bulwarks" we lose our grip on the rule of law, and we substitute in its place the preferences of mere judges.
 
 See
 

 Washington v. Trump
 
 ,
 
 858 F.3d 1168
 
 , 1184 (9th Cir. 2017) (Bybee, J., dissenting) (offering the important reminder that "[w]e are judges, not Platonic Guardians").
 

 ¶ 124 The point is not that our law cannot evolve. It is to remember that the constitution preserves extra-judicial means of our law's adaptation: (a) "amendment of the constitution through the super-majoritarian procedures set forth in its provisions," and (b) "implementation of policies embraced by the people through their representatives in the political branches of government" (such as by "adoption of statutes, regulations, and other laws within the limitations prescribed in the constitution").
 
 Houston
 
 ,
 
 2015 UT 40
 
 , ¶ 151,
 
 353 P.3d 55
 
 (Lee, A.C.J., concurring in part and concurring in judgment).
 

 ¶ 125 For these reasons I find it important to take a step back from the approach embraced by the majority. I would not begin by accepting the broadest conception of our opinion in
 
 Labrum v. Utah State Board of Pardons
 
 ,
 
 870 P.2d 902
 
 , 909-10 (Utah 1993). That decision admittedly deserves some measure of respect as a matter of
 
 stare decisis
 
 . But the majority in my view is extending the premises of the
 
 Labrum
 
 decision to their logical extreme-a step that
 
 stare decisis
 
 does not require.
 
 See
 

 supra
 
 ¶ 39 (noting that the Parole Board has asked us to limit
 
 Labrum
 
 "to its facts," but concluding that "our task is to faithfully apply our precedent" absent a request that we overrule it).
 
 Labrum
 
 did not decide the question presented here.
 
 [22]
 

 See
 

 infra
 
 ¶¶ 139-43. So we can uphold
 
 Labrum
 
 without ruling in Neese's favor. And in my view we should carefully consider the basis of the court's analysis in
 
 Labrum
 
 before extending it in the manner that the court does today.
 

 ¶ 126 The majority criticizes my approach on two principal grounds-(a) the concern that I am engaged in independent analysis of historical material without the benefit of adversary briefing,
 
 see
 

 supra
 
 ¶ 67; and (b) the assertion that I am urging a decision overruling
 
 Labrum
 
 while the court is just upholding that decision on
 
 stare decisis
 
 grounds,
 
 supra
 
 ¶¶ 51, 57. I respond to these and other points in detail below. For now I would note (1) that I favor supplemental briefing on the historical basis for our decision in this case; (2) that my colleagues are not just preserving
 
 Labrum
 
 but are extending it-establishing a new standard of due process in parole hearings that is nowhere dictated on the face of
 
 Labrum
 
 ; and (3) that the majority's extension of
 
 Labrum
 
 is not one expressly requested by Neese (and accordingly not subjected to adversary briefing).
 
 See
 

 infra
 
 ¶¶ 137-43.
 

 ¶ 127 My colleagues apparently prefer not to seek further briefing from the parties on the historical questions that I am addressing. That is their prerogative. But I would think that their decision to decline further briefing,
 
 see
 

 supra
 
 ¶¶ 50 n.5, 51, might blunt their criticism of my historical analysis of the due process clause.
 

 ¶ 128 The majority is establishing a significant new rule of constitutional law in resolving this case. It holds for the first time that the Utah Constitution guarantees a right to cross-examination in a parole hearing. That right is nowhere enshrined in our precedent-or at all dictated by the analytical framework of
 
 Labrum
 
 .
 

 ¶ 129 Neese himself has not invoked the
 
 Labrum
 
 opinion as a basis for the parole procedures he claims to be lacking. He bases his due process argument principally on federal authorities-citing
 
 Labrum
 
 only in his reply brief, and only there in an attempt to try to distinguish it (in response to the Parole Board's argument that Neese was afforded all of the process that he was due under
 
 Labrum
 
 ).
 

 ¶ 130 The bottom line is that the briefing on the state constitutional question presented is quite minimal. That leaves us with two choices-either to seek supplemental briefing or to move forward with what we have. I would seek further briefing. But I also find the matter adequately presented, and I see no barrier to our resolving it (either by application of precedent or by resort to historical materials).
 

 ¶ 131 I would resolve this issue by analyzing the text and original meaning of the due process clause of the Utah Constitution. Thus, I would apply the historical framework of due process that I have outlined previously.
 
 See
 

 In re Adoption of K.A.S.
 
 ,
 
 2016 UT 55
 
 , ¶¶ 45-100,
 
 390 P.3d 278
 
 (Lee, A.C.J., dissenting). And I would affirm the district court's decision dismissing Neese's claims because I find no basis in the text or original meaning of the Utah due process clause to call into question the procedural framework adopted by the Parole Board (much less, to sustain the specific procedures deemed required by the majority).
 

 ¶ 132 In the paragraphs below I begin with some background on the due process framework that I would apply. Then I analyze Neese's claim against this backdrop. And I close with some observations about concerns with the majority's approach even accepting the (non-originalist) premises of its analysis.
 

 I
 

 ¶ 133 The due process clause does not confer on the judiciary a roving "duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall."
 
 In re Discipline of Steffensen
 
 ,
 
 2016 UT 18
 
 , ¶ 7 n.2,
 
 373 P.3d 186
 
 (quoting
 
 Ownbey v. Morgan
 
 ,
 
 256 U.S. 94
 
 , 110-11,
 
 41 S.Ct. 433
 
 ,
 
 65 L.Ed. 837
 
 (1921) ). It implicates a historically driven test "measured by reference to 'traditional notions of fair play and substantial justice.' "
 
 Id
 
 . ¶ 7 (quoting
 
 ClearOne v. Revolabs
 
 ,
 
 2016 UT 16
 
 , ¶ 8,
 
 369 P.3d 1269
 
 ).
 

 ¶ 134 We have warned against the perils of a notion of due process as "a free-wheeling constitutional license for courts to assure fairness on a case-by-case basis."
 
 Id
 
 . Yet our cases have not always heeded these principles. As judges, too often we skate past the words "due process" and blithely assume the prerogative of constitutionalizing our personal sense of fair procedure. In so doing we forget about the "usual course" for assuring procedural fairness-the legal means of promulgating rules or laws regulating procedure.
 
 See
 
 id.
 

 (noting that the "usual course" for assuring fairness "is by promulgating rules of procedure"). That means is available here; the Parole Board has the authority and means of promulgating and amending the administrative rules that govern its proceedings.
 
 [23]
 
 And the Parole Board's rules should stand unless they can be shown to run afoul of the historically rooted standard of "due process."
 

 ¶ 135 The constitutional standard, moreover, can be understood only by reference to its text and historical meaning. The text of the clause is simple: "No person shall be deprived of life, liberty or property, without due process of law." UTAH CONST. art. I, § 7. This text implicates two sets of questions: (a) what sorts of proceedings trigger a right to "due process of law"; and (b) what procedures are secured by the guarantee of "due process of law."
 

 ¶ 136 We should answer both questions with reference to the historical understanding of the terms of the due process clause. First, the applicability of the due process clause should depend on whether the proceeding in question is one historically understood to threaten a deprivation of "life, liberty or property." And second, the procedures secured by this provision should look to those historically understood as rooted in the guarantee of "due process."
 

 ¶ 137 I consider these questions because, unlike the majority, I find no answer to the question presented in our precedent. The
 majority claims to find an answer in
 
 Labrum v. Utah State Board of Pardons
 
 ,
 
 870 P.2d 902
 
 (Utah 1993). It cites that opinion for the proposition that the due process clause "require[s] more than simply giving the inmate an opportunity to speak and 'point out errors' in his file" when the Parole Board "bases its decisions on untested allegations that an inmate has committed a sex offense."
 
 Supra
 
 ¶ 55 (citation omitted). In that circumstance the majority says that
 
 Labrum
 
 requires "advanced written notice of the alleged sex offense," an opportunity to call and examine "witnesses," and "an explanation of the Parole Board's decision."
 
 Id
 
 .
 

 ¶ 138 Yet none of these requirements are anywhere set forth in the
 
 Labrum
 
 opinion. Indeed there is nothing in
 
 Labrum
 
 that at all dictates the procedure that the court today endorses as a requirement of due process. And the court's extension of
 
 Labrum
 
 is not advocated by Neese, and thus has not been subjected to adversary briefing.
 

 ¶ 139 The majority claims to be following the "framework" of the
 
 Labrum
 
 opinion.
 
 Supra
 
 ¶¶ 27, 60-61. But
 
 Labrum
 
 doesn't establish an operative constitutional framework for application in future cases. It simply concludes-based on the "reality" that parole hearings "are analogous to sentencing hearings,"
 
 870 P.2d at
 
 908 -(a) that an inmate has some due process rights at the initial parole hearing,
 

 id.
 

 at 911 ; and (b) that those rights include the right to "know what information the Board will be considering at the hearing ... soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies,"
 
 id
 
 . at 909.
 

 ¶ 140 There is no clear rationale or "framework" for these decisions in the
 
 Labrum
 
 opinion. The closest the
 
 Labrum
 
 court comes to identifying a basis for its decision is the assertion that the procedure embraced by the court advances "two critical functions related to fundamental fairness"-"minimizing error and preserving the integrity of the [parole] process."
 
 [24]
 

 Id.
 

 ;
 
 see also
 

 id
 
 . at 910 (asserting that "[a]ccuracy and fairness are essential in proceedings which impinge as directly on personal liberty as original parole grant hearings"). The majority repeats that assertion here.
 
 See
 

 supra
 
 ¶ 24. It says that the right to call and cross-examine witnesses is similarly essential to advance these "critical functions."
 
 Supra
 
 ¶¶ 44-45.
 

 ¶ 141 But that conclusion is by no means dictated by
 
 Labrum
 
 . The "critical functions" formulation in
 
 Labrum
 
 is not a workable legal standard; it is a circular confirmation for whatever procedure a majority of this court may deem appropriate.
 
 Any
 
 additional procedure, after all, can be said to "minimiz[e] error" and "preserv[e] the integrity of the [parole] process."
 
 870 P.2d at 909
 
 .
 

 ¶ 142
 
 Labrum
 
 thus leaves unanswered the crucial question of the "framework" for deciding any future requirements of the Due Process Clause in parole hearings. To the extent there is a "framework" in
 
 Labrum
 
 it is the notion that due process requires whatever additional "procedure" a majority of this court deems to be helpful. And that is not a framework or rationale that is deserving of
 
 stare decisis
 
 deference.
 
 See
 

 State v. Guard
 
 ,
 
 2015 UT 96
 
 , ¶ 56,
 
 371 P.3d 1
 
 (overruling the "clear break" rule in part because it is unworkable and requires courts to exercise a large amount of discretion, "introduc[ing] a level of unpredictability that is not appropriate when dealing with the application of critically important rules").
 

 ¶ 143
 
 Labrum
 
 did not resolve the question of the demands of the due process clause in response to "untested allegations" of a sex offense raised in a parole setting.
 
 Supra
 
 ¶ 55. We are answering that question as a matter of first impression here. And I see no way to
 answer that question without a careful analysis of the original meaning of the due process clause of the Utah Constitution.
 

 II
 

 ¶ 144 Historically, only certain proceedings were understood to threaten a deprivation of "life, liberty or property" in a manner triggering a right to "due process."
 
 See infra
 
 Part II.A. The threshold question in my view is whether the parole hearings at issue here should count as that sort of proceeding. And for reasons set forth below I think the historical record cuts against such a conclusion.
 
 See infra
 
 Part II.B.
 

 ¶ 145 The
 
 Labrum
 
 court concluded otherwise.
 
 See
 

 Labrum v. Utah State Bd. of Pardons
 
 ,
 
 870 P.2d 902
 
 , 911 (Utah 1993). And
 
 Labrum
 
 , as noted, may be entitled to
 
 stare decisis
 
 deference on this threshold point. But
 
 stare decisis
 
 does not demand blind extension of our past decisions to their logical extreme. At most it requires a
 
 logical
 
 extension of our precedents. And to decide on the logical extension of
 
 Labrum
 
 we should inquire into the logic-or the theoretical basis-of that decision.
 
 [25]
 

 ¶ 146 The majority claims only to be applying the holding of the
 
 Labrum
 
 decision. But again the court is doing more than that. It is establishing a broad conception of
 
 Labrum
 
 -the notion that due process requires any additional parole procedure that a majority of the court views as advancing the interest of fundamental fairness.
 
 See
 

 supra
 
 ¶ 33.
 
 Labrum
 
 nowhere expressly articulates that as the controlling constitutional framework. So in that sense the majority itself is also revisiting the underlying basis for our decision in
 
 Labrum
 
 . It is just doing so implicitly.
 

 ¶ 147 The majority's due process construct yields no logical stopping point-and no real guiding legal principle. Indeed the majority itself nowhere expressly articulates an "anything a majority of us deem necessary is required" standard of due process. If that is in fact the operative principle then we should say so. If there is some other basis for the decision then we should say that. We owe it to the parties-and to lower courts and to the bar, who will be governed by our opinion-to identify a transparent legal basis for the direction of our law in this important area.
 
 [26]
 

 ¶ 148 To do that we need to return to first principles. And those principles, in my view, must start with an inquiry into the historical basis for extending the protections of the Due Process Clause to the parole process. We can reexamine the premises of the
 
 Labrum
 
 decision while still respecting the premises of the doctrine of
 
 stare decisis
 
 .
 
 [27]
 
 I would do so here on grounds set forth below.
 

 ¶ 149 At a minimum we need to consider the extent of the "process" that is due in a case like this one.
 
 Labrum
 
 , again, doesn't dictate an answer to that question.
 
 [28]
 
 And our determination of the demands of due process must accordingly be informed by an inquiry into the original understanding of the constitutional guarantee.
 
 [29]
 
 That understanding is simple and straightforward. The due process clause "refers to certain fundamental rights which [our] system of jurisprudence ... has always recognized."
 
 In re Adoption of K.A.S.
 
 ,
 
 2016 UT 55
 
 , ¶ 87,
 
 390 P.3d 278
 
 (Lee, A.C.J., dissenting) (alterations in original) (quoting
 
 Hurtado v. California
 
 ,
 
 110 U.S. 516
 
 , 536,
 
 4 S.Ct. 292
 
 ,
 
 28 L.Ed. 232
 
 (1884) ). Basic "notice" of the pendency of a legal proceeding is one of the "fundamental rights" long understood to be protected as a matter of due process.
 
 See
 

 In re Adoption of B.Y.
 
 ,
 
 2015 UT 67
 
 , ¶ 16,
 
 356 P.3d 1215
 
 . The other is an essential "opportunity" to be heard.
 

 Id.
 

 Yet the precise terms and conditions of these guarantees, if any, must be based on historical inquiry. The constitutionally guaranteed
 
 manner and means
 
 of notice and the right to be heard are not to evolve in accordance with the policy preferences of judges over time. Instead the core constitutional right is the preservation of
 
 some
 
 minimal notice and opportunity to be heard. And history is an important guide: "Procedures ... consistent with the common law and historical tradition [are] presumptively permissible, while new procedures [are] permissible so long as they [do] not deny one of the core protections of due process, such as a right to notice and a meaningful opportunity to be heard."
 
 In re Adoption of K.A.S.
 
 ,
 
 2016 UT 55
 
 , ¶ 90,
 
 390 P.3d 278
 
 (Lee, A.C.J., dissenting).
 

 ¶ 150 This is another basis for questioning the majority's extension of
 
 Labrum
 
 . The historical precedent cuts against the recognition of the now-constitutionalized right to call witnesses in a sentencing-like proceeding. I can accept, on
 
 stare decisis
 
 grounds,
 
 Labrum
 
 's premise that initial parole hearings are analogous
 to sentencing proceedings for due process purposes.
 
 [30]
 

 See
 

 supra
 
 ¶¶ 26-28;
 
 Labrum
 
 ,
 
 870 P.2d at 908
 
 . But that does not end the inquiry. We must also determine whether additional due process protections-beyond those identified in
 
 Labrum
 
 -must be afforded here.
 
 Labrum
 
 ,
 
 870 P.2d at 911
 
 . And we will search the historical record in vain for support for the idea that a defendant at sentencing had a due process right to be "heard"
 
 by calling witnesses
 
 or
 
 cross-examining them
 
 .
 
 See infra
 
 Part II.B. The newly-established due process right to a written sentencing decision is even more novel. To my knowledge no court has ever found such a right-not historically (as of the founding of the Utah Constitution) and not even in modern jurisprudence. And these are further reasons to doubt the constitutional propriety of the majority's decision.
 

 A
 

 ¶ 151 The threshold question is whether a parole hearing is the sort of proceeding that triggers a constitutional right to due process. Textually, that question turns on whether such a hearing threatens the deprivation of "life, liberty or property." And the originalist gloss on that question is whether the public understanding of this provision would encompass a hearing like the one at issue here.
 

 ¶ 152 One version of the originalist inquiry might start with the premise that modern parole hearings were unknown to the generation of the framing of the Utah Constitution. Because today's parole hearings were not invented until nearly two decades after the framing of our Due Process Clause,
 
 [31]
 
 the argument could be made that the right to due process does not attach.
 

 ¶ 153 The argument
 
 could
 
 be made. But it wouldn't be a good argument. It would be an argument based on a debunked form of originalism. Thoughtful originalists distinguish between an
 
 application
 
 of the constitution and the public
 
 understanding
 
 of the legal principle expressed by its terms.
 
 [32]
 
 They view the constitution-like all law-as consisting of
 
 legal principles
 
 expressed by the
 
 public understanding of its terms
 
 . But they do not foreclose
 
 new applications
 
 of those principles to circumstances unknown to the past. Quite the contrary, they view the prospect of such applications as essential to and inherent in the notion of constitutional law. Thoughtful originalists acknowledge that a constitution incapable of extending its principles to new applications cannot fulfill the promise of establishing fixed bulwarks to protect fundamental rights. And they thus adopt an originalist inquiry that looks to the public understanding of the constitution's terms, not the applications envisioned by the framers.
 

 ¶ 154 This is mainstream originalism, or "original public meaning" originalism. This form of originalism should be distinguished from "original intent" originalism.
 
 [33]
 
 The original intent inquiry is sometimes framed (often by critics) as turning on pure silliness-on "what would James Madison have thought" (or what would our Utah framers have thought) about a particular modern problem. And the answer to that question is usually obvious-nothing, because the framers never could have thought about our modern problems. But that is irrelevant to an original public meaning originalist, because she is looking for the public
 
 understanding
 
 of the operative legal principle at play. It
 doesn't really matter what the framers might have thought about particular modern problems, because that oversimplified inquiry has to do with
 
 applications
 
 , not the public
 
 understanding
 
 , of the legal principles enshrined in a constitutional text.
 

 ¶ 155 A Fourth Amendment problem may help to illustrate. The framers obviously would not have had any specific opinion about whether using a thermal-imaging device to examine a private home for unusual sources of heat (a sign of marijuana cultivation) is a "search" triggering the protections of the Fourth Amendment. But that is the wrong question to ask.
 

 ¶ 156 The right question to ask is whether the original public meaning of the legal principle encompassed within the protection against "unreasonable search and seizure," U.S. CONST. amend. IV, would have prohibited using a thermal-imaging device in that way, sans warrant. And it is entirely possible to conclude that the original understanding of that principle encompasses visual inspection by thermal-imaging-if, for example, we think of the notion of a "search" as any operation that violates, in any manner, a homeowner's reasonable expectation of privacy.
 
 See
 

 Kyllo v. United States
 
 ,
 
 533 U.S. 27
 
 , 34-35,
 
 121 S.Ct. 2038
 
 ,
 
 150 L.Ed.2d 94
 
 (2001) (Scalia, J., for the majority) (concluding that the original meaning of a Fourth Amendment "search" encompasses the use of a device by the government that "is not in general public use," to obtain information "regarding the interior of [a] home" that would previously have been unknowable without "physical 'intrusion into a constitutionally protected area' " (citation omitted)).
 

 ¶ 157 The Fourth Amendment example helps to focus the question presented in this case. The proper question before us is not whether the framers of the Utah Constitution would have thought that parole hearings trigger a right to due process. Instead we should ask what legal principle the Utah public would have understood in the guarantee of "due process" as a prerequisite to any deprivation of "life, liberty or property." And to answer that question we may need to look for historical analogies to the modern premises before us.
 

 ¶ 158 The majority, citing
 
 Labrum
 
 , says that the best analogy is to criminal sentencing proceedings.
 
 [34]
 

 Supra
 
 ¶ 27. That seems fair in a functional sense, as it is the parole board that makes the ultimate decision of how long a given person will remain incarcerated.
 
 See
 

 supra
 
 ¶ 27 ("The Parole Board's conduct in this case is, at a minimum, closely analogous to a sentencing court's considering uncharged or unconvicted conduct in fixing a defendant's sentence."). I will accept the analogy for present purposes.
 
 [35]
 

 ¶ 159 Even accepting the analogy, however, the historical record cuts against the majority's decision. There is little historical basis for a conclusion that the due process clause was understood to extend in any meaningful way to sentencing proceedings. The historical view-from the time of the framing of the U.S. Constitution and continuing through the nineteenth century-was that a person's "liberty" was implicated only
 by the determination of guilt.
 
 [36]
 
 The historical record suggests that no one thought that sentencing involved a second deprivation.
 
 [37]
 

 ¶ 160 In the eighteenth century and early nineteenth century there was no such thing as a sentencing proceeding as we understand it today. Upon a conviction after trial the court imposed a statutorily required penalty.
 
 [38]
 
 And that was the end of the matter. Things changed over the ensuing decades leading up to the framing of the Utah Constitution. There was a marked shift toward discretionary sentencing-first by judges and eventually through decisions made by parole boards.
 
 [39]
 
 Even then, however, no one conceived of trial-level "due process" rights as attaching to sentencing.
 

 ¶ 161 Throughout the late nineteenth and early twentieth centuries, judges and parole boards enjoyed wide discretion to determine the appropriate sentence.
 
 [40]
 
 Yet sentencing and parole proceedings were never treated like trials. The rules of evidence generally did not apply.
 
 Cf.
 

 Williams v. New York
 
 ,
 
 337 U.S. 241
 
 , 251,
 
 69 S.Ct. 1079
 
 ,
 
 93 L.Ed. 1337
 
 (1949) ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure.").
 
 [41]
 
 Sentencing judges had "wide
 discretion" to consider "[o]ut-of-court affidavits."
 
 Id.
 
 at 246,
 
 69 S.Ct. 1079
 
 . And there is no evidence that defendants had any constitutional right to call
 
 [42]
 
 or cross-examine witnesses.
 
 [43]
 

 Id.
 

 at 250
 
 ,
 
 69 S.Ct. 1079
 
 ("We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.").
 

 ¶ 162 At no point in this important timeframe (the nineteenth century-the period leading up to the framing of the Utah Constitution) did anyone raise a due process challenge to these discretionary sentencing proceedings. Certainly there are no judicial decisions establishing a constitutional right to due process in these proceedings.
 
 [44]
 

 ¶ 163 That is an important "dog that didn't bark." If the generation of the framing of the Utah Constitution viewed the constitutional guarantee of due process of law to attach to sentencing proceedings, surely someone would have raised the argument.
 
 [45]
 
 Surely a
 court would have endorsed that view.
 
 [46]
 

 ¶ 164 Yet the historical record is silent on this matter. And that is significant.
 
 [47]
 
 It suggests that the public understanding of the right to "due process of law" largely did not extend to sentencing proceedings.
 
 [48]
 
 The apparent premise of this view is that a sentencing does not involve an independent "depriv[ation] of life, liberty or property"-such deprivation occurs at the guilt phase of a trial, and there is no second deprivation of liberty implicated by sentencing. Any decision to impose less than the maximum sentence, in this view, is an act of grace
 
 [49]
 
 -a
 grant of greater liberty than the defendant was entitled to. And on that basis the original understanding of the right to due process does not extend to sentencing proceedings.
 
 [50]
 

 ¶ 165 This does not, of course, mean that no process should ever be afforded in such proceedings. It just means that the question is primarily left to policymakers-to those charged with exercising the discretion to decide on appropriate rules for sentencing proceedings.
 
 [51]
 

 ¶ 166 Our
 
 Labrum
 
 opinion resolved this matter the other way.
 
 See
 

 Labrum
 
 ,
 
 870 P.2d at 909
 
 ("[D]ue process ... requires that the inmate know what information the Board will be considering at the hearing and that the inmate know soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies."). That decision may be entitled to deference as a matter of
 
 stare decisis
 
 . But, again, that does not mean that we are required to
 
 extend
 
 that decision further. And the above history provides grounds for leaving
 
 Labrum
 
 where it is and not inventing additional procedures not established by that opinion.
 

 B
 

 ¶ 167 The above-cited history is also relevant to the second due process question presented-to the nature or extent of the procedures guaranteed by "due process." Here we can assume that a parole hearing is the sort of proceeding involving a deprivation of liberty that triggers a right to due process. But we still have to decide on the content of the constitutional guarantee-on how much process is constitutionally due.
 

 ¶ 168 I see no ground for constitutionalizing whatever procedure a majority of this court might find reasonable. That kind of policymaking is not in the nature of constitutional interpretation. If we are to constitutionalize a field of law we must root our decision in the text and original meaning of the constitution. And such an inquiry would look to the procedures viewed as inherent in due process at the time of the framing of the Utah Constitution.
 

 ¶ 169 Those procedures, as noted above, encompassed the basic rights of notice and an opportunity to be heard in accordance with "some settled course of judicial proceedings,"
 
 In re Adoption of K.A.S.
 
 ,
 
 2016 UT 55
 
 , ¶ 88,
 
 390 P.3d 278
 
 (Lee, A.C.J., dissenting) (citation omitted)-rights long viewed as "fundamental" to our "system of jurisprudence,"
 
 id.
 
 ¶ 87 (Lee, A.C.J., dissenting) (quoting
 
 Hurtado v. California
 
 ,
 
 110 U.S. 516
 
 , 529,
 
 4 S.Ct. 292
 
 ,
 
 28 L.Ed. 232
 
 (1884) ).
 
 See also
 
 LUCIUS POLK MCGEHEE, DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION 2 (1906) ("The basis of due process" consists of "orderly proceedings and an opportunity to defend."). Yet the precise means of notice and an opportunity to be heard are not enshrined in the guarantee of due process.
 
 See
 

 In re Adoption of K.A.S.
 
 ,
 
 2016 UT 55
 
 , ¶ 87,
 
 390 P.3d 278
 
 . Our system leaves decisions on those matters to adaptation and evolution over time by policymakers.
 

 ¶ 170 Neese was afforded a basic right of notice and an opportunity to be heard. He was advised of the pendency of the parole hearing and given a chance to present his view on the questions presented.
 
 See
 
 UTAH ADMIN. CODE r. 671-202-1. In other words he was afforded the procedures established by this court in our
 
 Labrum
 
 decision.
 
 See
 

 Labrum
 
 ,
 
 870 P.2d at 909
 
 ("[D]ue process ... requires that the inmate know what information the Board will be considering at the hearing and that the inmate know soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies."). And I see no reason to conclude that the original understanding of "due process" would have entitled him to any more than that.
 

 ¶ 171 Certainly the historical record does not support the notion of a right to call witnesses.
 
 [52]
 
 Or to receive a written decision explaining the basis of the sentencing decision.
 
 [53]
 

 ¶ 172 Historically, the defendant's rights at sentencing were minimal. At the time of the framing of the Utah Constitution no one would have thought that the right to due process implicated a right to call witnesses or review a written sentencing decision.
 
 See
 
 CAMPBELL, LAW OF SENTENCING ,
 
 supra
 
 , at § 10:5 (stating that the "strong nationwide trend to require reasons for sentences" began only in the "late-1970s"). Indeed the process afforded by the Parole Board far exceeds anything that would have been available historically. The Board gives prospective parolees a right to review everything in the Board's file, UTAH ADMIN. CODE r. 671-303-1(1),
 
 [54]
 
 an opportunity to respond in writing to any matters in the file,
 
 id.
 
 r. 671-303-1(2), the prerogative of appearing and testifying to the Board,
 
 id.
 
 r. 671-301-1(A) & (B), and even a right to file requests for reconsideration or "special attention reviews,"
 
 id.
 
 r. 671-316-1 (redetermination review procedure);
 
 id.
 
 r. 671-311-1 (special attention review procedure). And the Board guarantees that its "[d]ecisions ... will be reduced to a written order," which generally are "accompanied by a brief rationale for the order."
 
 Id.
 
 r. 671-305-1.
 

 ¶ 173 This process goes well beyond that afforded to convicted persons at sentencing proceedings in the nineteenth century. And that is a further basis for rejecting the majority's decision.
 

 III
 

 ¶ 174 The majority hedges in its articulation of the due process rights available in a parole hearing. It says that the constitutional right "to call witnesses and present documentary evidence" attaches "unless the safe and effective administration of the prison system requires otherwise."
 
 Supra
 
 ¶ 43. That may be a helpful caveat. At the very least it is a wise recognition of our lack of expertise and understanding of the parole process.
 

 ¶ 175 But the court's caveat also highlights a basic problem with the majority's analysis. We have little knowledge of the day-to-day operations of the Parole Board. And the briefing in this case offers little insight into the possible effects of a decision to announce a new constitutional right to call witnesses. Perhaps that means that any right to call witnesses must be framed as tentative and conditional. But this also underscores a problem with the decision to constitutionalize this field of law.
 

 ¶ 176 We have a means of preserving the need for a "safe and effective administration
 of the prison system." It is to respect the traditional role of the Parole Board in adopting rules of procedure in this field-and to leave the limits of the Due Process Clause to the procedures historically understood to be guaranteed by the constitution.
 

 ¶ 177 We undermine the orderly evolution of our law when we constitutionalize fields meant for policymakers. Our constitutional decisions are set in stone, so to speak, and are not easily set aside. We should take that into account before we enshrine a right to call witnesses or to receive a written sentencing decision.
 

 ¶ 178 It may be a step in the right direction to acknowledge the countervailing interest in "the safe and effective administration of the prison system." But that does not adequately capture the costs and concerns on the other side of the balance. We cannot properly talk about the best process-let alone the constitutionally mandated process-for a
 
 parole system
 
 if we are focused only on the "effective administration of
 
 the prison system
 
 ." We must also account for the needs of an effective
 
 parole system
 
 . And the most we can say on that point here is that those charged with managing that system have determined that the right to call or cross-examine witnesses is a procedure that interferes with the "safe and effective administration" of parole in Utah. Surely there are good reasons for that decision.
 

 ¶ 179 We can characterize the Parole Board's process as effectively "a miniature criminal trial."
 
 Supra
 
 ¶ 46. But that does not make it so. In our system of justice the Parole Board performs a very different function from the trial court. The Board is not deciding on guilt or innocence. Nor is it even resolving the questions presented to a trial court at sentencing-like the important question, for example, of whether to impose a sentence or instead suspend it upon conditions of probation.
 
 See
 
 UTAH CODE § 77-18-1(2)(a).
 

 ¶ 180 Instead, the Parole Board is making a more holistic, discretionary decision-whether and when to allow an inmate committed to serve up to a statutory maximum term to be released on parole at an earlier date.
 
 [55]
 
 These decisions are sensitive ones. And our law has long recognized that we can account for all of these sensitive considerations only if we preserve the subjective, discretionary judgment of the Parole Board.
 

 ¶ 181 We interfere with that discretion when we constitutionalize the Parole Board's processes. And in so doing we threaten the longstanding premises of parole in our criminal justice system. The more we formalize this process the more we threaten the equilibrium of our existing system of criminal justice. We should hesitate before proclaiming a full understanding of the costs and benefits of superimposing additional procedures on a system that remains mostly hidden from judicial scrutiny.
 
 See
 
 UTAH CODE § 77-27-5(3) ("Decisions of the board in cases involving paroles, pardons, commutations or terminations of sentence ... are final and are not subject to judicial review.").
 

 ¶ 182 The "critical functions" of due process cited in
 
 Labrum
 
 are not a legal test.
 
 See
 

 supra
 
 ¶ 28 (citing the minimization of "error" and the promotion of the "perception of fairness" as considerations requiring the procedures required by the majority);
 
 Labrum
 
 ,
 
 870 P.2d at 910
 
 (describing "[a]ccuracy and fairness" as "essential" concerns of due process). They are just
 
 benefits
 
 of additional procedure. And if we cite only the benefits-the upsides-of additional procedure we will have a one-way ratchet that will always result in
 
 more
 
 constitutionally required procedure.
 

 ¶ 183 That is the majority's methodology. It treats the minimization of error and the promotion of the perception of fairness as the
 touchstones for assessing the requirements of the due process clause.
 
 See
 

 supra
 
 ¶ 28. And, not surprisingly, the court concludes that more procedure-a right to call witnesses and to a written ruling-is required.
 

 ¶ 184 This is another fatal flaw in the majority's approach. The court ultimately does not identify an operative legal principle or legal test. It simply identifies grounds for ever-expanding procedural mechanisms. The court purports to identify only two new due process rights at parole hearings-the right to call witnesses and the right to a written ruling. But its mode of reasoning provides no stopping point. If we take the majority opinion at face value we can anticipate that more and more procedural rights are to come. Under the majority's approach any additional mechanisms that can be thought to decrease the risk of error and increase the perception of fairness may eventually be "required" by the due process clause. So long as a majority of the court concludes that additional procedures advance these goals, they may be viewed as required by the Utah Constitution.
 
 [56]
 

 ¶ 185 The court's articulated factors are as fuzzy and unworkable as they are unmoored from history. The inquiry into the perception of fairness seems particularly unmanageable. Fairness is a two-way street. And the inmate is only one side of the criminal justice equation. The other side encompasses interests protected by the state-the public generally and also victims. And fairness to those groups' interests should also be weighed in the balance.
 

 ¶ 186 I understand that an inmate in Neese's position might "question the integrity of a system in which the Parole Board could ... adjudge him a sex offender and postpone his release date for up to twenty-eight years based solely on unproven allegations and without ... the opportunity to call witnesses."
 
 Supra
 
 ¶ 32 (emphasis omitted). But what about the victim of Neese's crimes? And what about the general public, with an interest in seeing that inmates are not released on parole in circumstances in which there is a perceived risk to the public? What about the perception of fairness on this side of the balance?
 

 ¶ 187 Neese's victim saw him convicted of crimes sustaining a sentence of up to thirty-two years in prison. And the victim understood that Neese could be required to serve that full term unless the Parole Board exercised its discretion to authorize his early release on parole. Under longstanding procedures, the Parole Board could be expected to exercise its discretion to consider conduct not resulting in a conviction,
 
 see
 

 Alvillar v. Bd. of Pardons & Parole
 
 ,
 
 2014 UT App 61
 
 , ¶ 6,
 
 322 P.3d 1204
 
 , 1208 ("[T]he Board may consider and weigh any factors that it deems relevant to its determination of whether or not an inmate will be afforded parole ...."), and to require Neese to participate in rehabilitation programs in prison to assure that any release would not cause undue risk to the public.
 
 See, e.g.
 
 , UTAH ADMIN. CODE r. 671-402-1(A) ("The Board may add special conditions to a standard parole agreement. Special conditions are generally intended to help hold an offender accountable or to help rehabilitate an offender."). And Neese's victim would have understood that Parole Board procedures would not have allowed Neese to call witnesses in any parole hearings.
 

 Id.
 

 r. 671-308-3(b) ("Only the offender, a person appointed by the Board to assist an offender pursuant to this rule, or a victim as provided for by Utah law may present testimony or comment during a hearing.").
 

 ¶ 188 All of these expectations will be dashed by the majority's decision today. And Neese's victim will "justly question the integrity of a system,"
 
 supra
 
 ¶ 32, that allows Neese to change the rules of the parole game midstream.
 

 ¶ 189 The majority's warning about the effects of the Parole Board's procedures on plea bargains strikes me as backwards. I do
 not see how we can say that a defendant has a "justifiabl[e]" expectation that charges dismissed on a plea bargain will not "come roaring back at their parole hearing."
 
 Supra
 
 ¶ 33. Our longstanding parole system makes that a very real possibility. It tells convicted defendants that they may well have to serve the full extent of their imposed sentence,
 
 see
 
 UTAH CODE § 77-18-4(2) & (3), that the decision to release them early is a matter within the discretion of the Parole Board,
 
 see
 

 id.
 
 § 77-18-4(3), that that discretion can take into account a range of considerations affecting the inmate's risk to the public,
 
 see
 

 Alvillar
 
 ,
 
 2014 UT App 61
 
 , ¶ 6,
 
 322 P.3d 1204
 
 , and that the inmate has no right to call witnesses at a parole hearing,
 
 see
 
 UTAH ADMIN. CODE r. 671-308-3(b). With all this in mind, a defendant like Neese is in no position to claim surprise at the Parole Board's approach-or concern about the effect on incentives in plea-bargaining.
 

 ¶ 190 If anything it is Neese's victim whose interests and expectations are being undermined. By establishing a new set of procedural rights never before established in the parole system the majority undermines Neese's victim's justifiable expectations. It is the victim whose expectations are being undermined here. And victims like her "will be justifiably wary" of plea deals involving the dismissal of sex-offense charges, if the victims know they may be called in to testify in future parole hearings.
 

 ¶ 191 We can disagree about whether a right to call witnesses at a parole hearing is a good idea. But so long as we are talking about fairness and justifiable expectations we should paint the full picture. And that picture must include victims and the public.
 

 Neese himself has not asserted that this case is controlled by
 
 Labrum
 
 . The
 
 Labrum
 
 opinion isn't even cited in Neese's opening brief. And the discussion of
 
 Labrum
 
 in the reply brief amounts only to (a) an assertion that
 
 Labrum
 
 "did not address what process was due in a parole hearing in which the prisoner's status as a sex offender was adjudicated"; and (b) an assertion that the federal Due Process Clause should be interpreted more expansively and that those "broader protections ... are supreme." Appellant Reply Br. at 11-12.
 

 For these reasons it seems to me that the majority is engaging in the very enterprise it seeks to pin on me-of advocating a basis for resolving this case that is not precisely presented by the parties. The majority's extension of
 
 Labrum
 
 is a matter of the court's own independent analysis. I say that to highlight what I see as some overexuberance in the court's criticism of my independent analysis of the due process clause, and not to question the court's right to engage in this independent analysis. The due process question is adequately presented and briefed, after all, and the court is not just entitled but expected to use its own lights in resolving it.
 

 Utah Const. art. VII, § 12 (2)(a) ("The Board of Pardons and Parole ... may grant parole, ... commute punishments, and grant pardons after convictions, ... subject to regulations as provided by statute."); Utah Code § 77-27-5(5) ("In determining when, where, and under what conditions offenders serving sentences may be paroled [or] pardoned, ... the board shall ... develop and use a list of criteria for making determinations under this [s]ubsection ....");
 

 id.
 

 § 77-27-9(4)(a) ("The board may adopt rules consistent with law for its government, meetings and hearings, the conduct of proceedings before it, the parole and pardon of offenders, the commutation and termination of sentences, and the general conditions under which parole may be granted and revoked.");
 
 Utah Admin. Code r. 671-101
 
 ("Board of Pardons rules shall be processed according to state rulemaking procedures. ... Rules are to be interpreted with the interests of public safety in mind so long as the rights of a party are not substantially affected.").
 

 The doctrine of
 
 stare decisis
 
 urges courts to apply "the first decision by a court on a
 
 particular question of law
 
 ... [to] later decisions by the same court."
 
 State v. Thurman
 
 ,
 
 846 P.2d 1256
 
 , 1269 (Utah 1993) (emphasis added). And my approach is consistent with that principle.
 
 Labrum
 
 says that some process is due "to the extent that the analogy [between parole hearings and sentencing hearings] holds."
 
 Labrum v. Utah State Bd. of Pardons
 
 ,
 
 870 P.2d 902
 
 , 908 (Utah 1993). But
 
 Labrum
 
 also notes that determining "[t]he extent to which additional due process protections must be afforded inmates in [a parole hearing] will require case-by-case review."
 

 Id.
 

 at 911
 
 . Applying the decision in
 
 Labrum
 
 simply requires this court to afford due process rights to the extent that a parole hearing is analogous to a sentencing hearing and to assess additional due process on a case-by-case review. My analysis does exactly that.
 
 See infra
 
 Part II.
 

 I seek not to overrule
 
 Labrum
 
 . Or even to "confine [it] to its precise facts."
 
 Supra
 
 ¶¶ 56-57. I am just observing that the
 
 Labrum
 
 opinion does not dictate an answer to the question presented here. To decide how much procedure is constitutionally required in response to "untested allegations" of a sex crime in a parole hearing we must do more than just apply
 
 Labrum
 
 .
 

 The majority is surely doing more than that in its opinion. It is not just citing
 
 Labrum
 
 as dictating the answer to the question presented. It is establishing a wholly new constitutional requirement based on the majority's sense of where best to draw the line-concluding that the right to cross-examination is essential to "due process" in response to an allegation of a sex crime raised in a parole hearing, except where "the safe [and effective] administration of the prison system requires otherwise."
 
 Supra
 
 ¶¶ 43, 53. That may be a good line to draw. But the line doesn't come from
 
 Labrum
 
 . It comes from the majority's sense of fairness in the unique circumstances presented in this case.
 

 I'm all for "transparency."
 
 Supra
 
 ¶ 58. That's the whole point of my opinion. Because I find no answer to the question presented here in
 
 Labrum
 
 I am seeking to identify a basis for decision in the text and original meaning of the Utah Constitution-the source of first principles for any question not clearly controlled by settled precedent. This seems to me the path of true transparency.
 
 Supra
 
 ¶ 58.
 

 I cannot see how my resort to first principles would undermine the "coherence" of our jurisprudence in this field.
 

 Supra
 

 ¶ 64
 
 . I find the implicit premises of the
 
 Labrum
 
 line of cases to be quite incoherent. And the whole point of my historical inquiry is to try to bring discipline and transparency to this important field.
 

 It seems to me that it is the majority that is engaged in the enterprise of deciding our cases by a " 'show of hands' " rather than a " 'rule of law.' "
 
 Supra
 
 ¶ 65 (quoting
 
 Hein v. Freedom From Religion Found., Inc.
 
 ,
 
 551 U.S. 587
 
 , 618,
 
 127 S.Ct. 2553
 
 ,
 
 168 L.Ed.2d 424
 
 (2007) (Scalia, J., concurring in the judgment)). The standard the court attributes to the
 
 Labrum
 
 line of cases is all about a show of hands-attributing to the due process clause whatever standards of fairness a majority of this court can agree to in any given circumstance. That is not a coherent legal standard. And it is not a workable rule of law.
 

 Cf.
 

 Gen. Motors Corp. v. Tracy
 
 ,
 
 519 U.S. 278
 
 , 312,
 
 117 S.Ct. 811
 
 ,
 
 136 L.Ed.2d 761
 
 (1997) (Scalia, J., concurring) (stating that "the so-called 'negative' Commerce Clause is an unjustified judicial invention, not to be expanded beyond its existing domain" but also reaffirming willingness to "enforce on
 
 stare decisis
 
 grounds" the applications of that doctrine in prior cases).
 

 Nor do the cases handed down in
 
 Labrum
 
 's wake. Our subsequent decisions admittedly accepted the premises of
 
 Labrum
 
 -that the due process guarantee extends to at least some parole proceedings, that due process is aimed at assuring fairness in those proceedings, and that "this procedural right [i]s not unlimited."
 
 Supra
 
 ¶ 62. Thus, in
 
 Neel v. Holden
 
 ,
 
 886 P.2d 1097
 
 (Utah 1994), and
 
 Monson v. Carver
 
 ,
 
 928 P.2d 1017
 
 (Utah 1996), we established a few new due process rights in the parole process and declined to establish others. But our opinions still failed to provide a concrete legal basis for the lines that we were drawing-except the bare notion that the procedures we required struck the court as necessary to protect a vague principle of fairness and the procedures we refused to endorse seemed unnecessary.
 
 See
 

 Neel
 
 , 886 P.2d at 1103 (refusing to require the disclosure of confidential information "when that disclosure might lead to harm of a third person");
 
 Monson
 
 ,
 
 928 P.2d at 1030
 
 (refusing to allow inmate to call character witness because the court concluded that the proffered testimony would not "substantially further[ ] the accuracy and reliability of the [Parole] Board's fact-finding process"). Thus, our precedents don't answer the question presented in this case. And in my view that requires us to return to first principles to find a guiding standard for our decisions in this important field.
 

 The majority, to its credit, recognizes the importance of an inquiry into the "original meaning of the Utah Constitution when [we are] properly confronted with constitutional issues."
 
 Supra
 
 ¶ 67. But it then criticizes my historical inquiry on the basis of a supposed lack of "prompting from the parties."
 
 Supra
 
 ¶ 67. And it questions my originalist analysis on the basis of a lack of adversary briefing.
 
 Supra
 
 ¶ 67.
 

 To the extent the majority is suggesting that the originalist questions that I am exploring are not properly presented I disagree. The question of the reach and extent of the due process guarantee in a parole proceeding like this one is the key question presented for our decision. And because I find no answer to that question in our precedent it is essential to resort to first principles. In that sense the parties have effectively prompted an analysis of the historical material that I am examining.
 

 To the extent the court is lamenting the lack of detailed briefing on the historical questions at issue I agree-but I find the majority's criticism puzzling. Because I find the originalist questions I address here properly presented but not adequately briefed I would have preferred requesting supplemental briefing.
 

 "Our cases," after all, "have not said that an original parole hearing is identical for all purposes to a sentencing hearing before the trial court."
 
 Monson
 
 ,
 
 928 P.2d at 1029
 
 .
 

 Our state constitution was written and adopted in 1895 and took effect in 1896. Utah's indeterminate sentencing regime was instituted by statute in 1913.
 
 See
 

 1913 Utah Laws 192
 
 -93.
 

 Lawrence B. Solum,
 
 The Fixation Thesis: The Role of Historical Fact in Original Meaning
 
 ,
 
 91 Notre Dame L. Rev. 1
 
 , 21 (2015) ("[T]he communicative content of the constitutional text is fixed at the time of framing and ratification, but the facts to which the text can be applied change over time." (emphasis omitted)).
 

 John O. McGinnis & Michael B. Rappaport,
 
 Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction
 
 , 103 NW. U.L. Rev. 751, 761 (2009) ("[O]riginal public meaning, in contrast to original intent, interpret[s] the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment ... [and] is now the predominant originalist theory ....").
 

 The majority also analogizes Neese's parole hearing to "a judicial fact-finder ... adjudicating the inmate guilty of a criminal offense," or a "criminal trial[ ] and the closely related context of [a] prison disciplinary proceeding[ ]."
 
 Supra
 
 ¶ 29. Yet the court nowhere explains how these alternative analogies cut.
 

 But this premise is by no means a given.
 
 See, e.g.
 
 ,
 
 Vitek v. Jones
 
 ,
 
 445 U.S. 480
 
 , 493,
 
 100 S.Ct. 1254
 
 ,
 
 63 L.Ed.2d 552
 
 (1980) ("Undoubtedly,
 
 a valid criminal conviction and prison sentence
 
 extinguish a defendant's right to freedom from confinement. Such a
 
 conviction and sentence
 
 sufficiently extinguish a defendant's liberty 'to empower the State to confine him in any of its prisons.' ") (emphases added) (citations omitted);
 
 Meachum v. Fano
 
 ,
 
 427 U.S. 215
 
 , 224,
 
 96 S.Ct. 2532
 
 ,
 
 49 L.Ed.2d 451
 
 (1976) ("[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution"). It would not be unreasonable to say that a convicted defendant's due process rights are exhausted after "a conviction and sentence." Under this view, the due process clause would require
 
 absolutely nothing
 
 during original parole hearings, because the defendant's liberty interest has been extinguished "until the maximum [incarceration] period has been reached unless sooner terminated or commuted by authority of the Board of Pardons and Parole." Utah Code § 77-18-4(3).
 

 Cf.
 

 Williams v. New York
 
 ,
 
 337 U.S. 241
 
 , 245-46,
 
 69 S.Ct. 1079
 
 ,
 
 93 L.Ed. 1337
 
 (1949) (highlighting how, historically, "strict evidentiary procedural limitations" governed proceedings where the "question for consideration [was] the guilt of the defendant," but during sentencing, a judge was not "hedged" by procedural rules and "could exercise a wide discretion").
 

 See
 
 Stephen A. Saltzburg,
 
 Due Process, History, and
 
 Apprendi v. New Jersey,
 
 38 Am. Crim. L. Rev. 243
 
 , 244 (2001) ("[T]here were no announced standards, procedural or substantive, to control a sentencing judge or jury ....").
 

 Alan M. Derschowitz,
 
 Criminal Sentencing in the United States: An Historical and Conceptual Overview
 
 ,
 
 423 Annals Am. Acad. Pol. & Soc. Sci. 117
 
 , 124-25, 128 (1976) ("Specific crimes were punished, according to the colonial criminal codes, with relatively specific penalties.");
 
 see, e.g.
 
 , Compiled Laws of the Terr. of Utah § 1840 (1876) ("The several sections of this code which declare certain crimes to be punishable as therein mentioned devolve a duty upon the court authorized to pass sentence, to determine and impose the punishment prescribed.").
 

 Derschowitz,
 
 Criminal Sentencing
 
 ,
 
 supra
 
 , at 128 (describing the movement over time from statutorily-prescribed sentences for specific offenses to an indeterminate sentencing regime); Alan C. Michaels,
 
 Trial Rights at Sentencing
 
 ,
 
 81 N.C. L. Rev. 1771
 
 , 1812 n.169 (2003) ; Arthur W. Campbell, Law of Sentencing §§ 1:2-1:3 (3d ed. 2004).
 

 See generally
 
 Carissa Byrne Hessick & F. Andrew Hessick,
 
 Procedural Rights at Sentencing
 
 ,
 
 90 Notre Dame L. Rev. 187
 
 (2014) ;
 
 see also
 
 Campbell, Law of Sentencing ,
 
 supra
 
 , at § 9:3 ("[S]entences ... determined by trial judges ... ride upon one of the most powerful and pervasive doctrines in the law of sentencing: any sentence within constitutional and statutory limits will be upheld on appeal as long as it was selected by the proper exercise of judicial discretion.").
 

 The majority cites cases purportedly undermining this conclusion. It says that the cases cited in
 
 Williams
 
 establish that certain "procedural protections may have been understood to apply to sentencing proceedings in the period leading up to ratification of the Utah Constitution."
 
 Supra
 
 ¶ 75. The majority's interpretation of the cases it cites may well be correct. But these cases tell us nothing of relevance to the question presented here. The question before us is whether the procedural guarantees
 
 of the due process clause
 
 were understood to apply in sentencing proceedings. Nothing in the majority's cited cases speaks to that question. These cases suggest, at most, that certain rules of evidence and procedure were deemed to apply at sentencing.
 
 Compare
 

 supra
 
 ¶ 72 (stating that the cases
 
 Williams
 
 relied on "may stand for the proposition that sentencing judges must
 
 adhere
 
 to norms of due process when settling on a sentence"),
 
 with
 

 State v. Reeder
 
 ,
 
 79 S.C. 139
 
 ,
 
 60 S.E. 434
 
 , 435 (S.C. 1908) (upholding the trial court's consideration of "affidavits tending greatly to aggravate the crime" without any reference to due process),
 
 and
 

 State v. Smith
 
 ,
 
 2 S.C.L. (2 Bay) 62
 
 , 63 (S.C. Ct. Const. App. 1796) (allowing the defendant to submit mitigating evidence to the sentencing court without any reference to due process),
 
 and
 

 Kistler v. State
 
 ,
 
 54 Ind. 400
 
 , 404 (Ind. 1876) (relying on the Cruel and Unusual Punishments Clause to ensure "that all penalties are proportioned to the nature of the offence" without any reference to due process),
 
 and
 

 People v. Vermilyea
 
 ,
 
 7 Cow. 108
 
 , 143 (N.Y. Sup. Ct. 1827) (nothing that sentencing courts should consider "the circumstances in evidence" without any reference to due process). In fact, the
 
 Reeder
 
 court even notes that admitting aggravating affidavits does
 
 not
 
 raise constitutional concerns because "the verdict of the jury is not affected."
 
 60 S.E. at 435
 
 . And the defendant's "constitutional right to be confronted by witnesses against him and to have the privilege of cross-examining them" terminates once the jury decides the guilt phase of the trial, so long as the trial judge does not "attempt to alter the verdict of the jury."
 

 Id.
 

 The majority's cases on character evidence,
 
 see
 

 supra
 
 ¶ 78, fall short for similar reasons. We can stipulate to the possibility that "character evidence was often introduced for sentencing purposes" during the nineteenth century.
 
 Supra
 
 ¶ 78. But that tells us nothing about whether the right to introduce such evidence-or to present any other evidence-was viewed as an element of the constitutional right to "due process." The majority has cited nothing in support of that proposition. And the cases it does cite speak only to the applicability of rules of evidence or procedure-not the requirements of due process. Our rules of evidence and procedure are certainly amenable to adaptation and amendment over time. And I'm quite open to the possibility of amending such rules to account for the current needs of our sentencing system. But the availability of that mechanism of adaptation does not tell us that the constitutional guarantee of due process must also evolve.
 

 See
 
 Campbell, Law of Sentencing ,
 
 supra
 
 , at § 13:20 ("Just as there is no constitutional right for all offenders to confront witnesses at sentence hearings, there is as yet no recognized constitutional right to present witnesses on their behalf.");
 
 see also
 

 Reeder
 
 ,
 
 60 S.E. at 435
 
 .
 

 Reeder
 
 ,
 
 60 S.E. at 435
 
 ("Certainly there is no ground for saying that [submitting affidavits in aggravation during a sentencing proceeding] would deny to the defendant the constitutional right to be confronted by witnesses and to have the privilege of cross-examining them, for the reason that the verdict of the jury is not affected."). It is not even necessarily true that a defendant's traditional right to attend his own sentencing hearing,
 
 see
 
 Francis Wharton, a Treatise on the Criminal Law of the United States 54, 298 (1874), springs from due process. Campbell, Law of Sentencing ,
 
 supra
 
 , at § 9:14 ("American caselaw reveals no uniform source of authority for an offender's right to be present at sentencing. Depending on the jurisdiction, it is said to arise from common law, the federal constitution, state constitution, statutes, or court rules."). Due process might not even require a sentencing hearing at all.
 
 Cf.
 
 Campbell, Law of Sentencing ,
 
 supra
 
 , at 10:4 ("Most jurisdictions consign to judicial discretion the decision to hold sentencing hearings.").
 

 Stephen Saltzburg, for example, quotes Justice O'Connor's dissenting opinion in
 
 Apprendi v. New Jersey
 
 ,
 
 530 U.S. 466
 
 , 523-54,
 
 120 S.Ct. 2348
 
 ,
 
 147 L.Ed.2d 435
 
 (2000), and states that she "is undoubtedly correct that the Court never ... worried about due process when it came to non-capital sentencing. However, she did not explain why the Court should not have, or why liberty had been given such short shrift for so many years." Saltzburg,
 
 Due Process
 
 ,
 
 supra
 
 , at 249. A plausible explanation, given the historical record, is simply that litigants never raised the issue. It is not that "liberty had been given such short shrift," but rather that no defense attorney ever imagined that "due process" might demand extra procedures at sentencing.
 

 The majority implies that appellate avenues for asserting a due process challenge to a sentencing proceeding may have been foreclosed by governing rules of appellate jurisdiction.
 
 See
 

 supra
 
 ¶¶ 81-82. But the majority's cited authority does not support this conclusion.
 
 See
 

 Appellate Review of Sentencing Procedure
 
 ,
 
 74 Yale L.J. 379
 
 , 381-82 & n.22 (1964) (noting that "[s]everal cases ... stand as exceptions to the rule of non-review" and that "[c]lose examination of this group of decisions ... reveals that they contain an implicit distinction between review of the merits of a sentence and review of the procedure leading to a sentence," where procedure "cover[s] not only ... traditional elements, but also the format and criteria which the judge uses in imposing sentences, including presentencing reports, requests for probation and referrals for mental examination"). Other authority, moreover, cuts the other way-indicating that a party with a federal constitutional basis for challenging a sentence was entitled to raise that challenge on appeal.
 
 See e.g.
 
 ,
 
 United States v. Tucker
 
 ,
 
 404 U.S. 443
 
 , 447,
 
 92 S.Ct. 589
 
 ,
 
 30 L.Ed.2d 592
 
 (1972) (holding that federal due process is violated when a sentence is imposed on the basis of "misinformation of constitutional magnitude");
 
 Townsend v. Burke
 
 ,
 
 334 U.S. 736
 
 , 741,
 
 68 S.Ct. 1252
 
 ,
 
 92 L.Ed. 1690
 
 (1948) (holding that federal due process is violated when a court relies on "extensively and materially false" evidence to impose a sentence on an uncounseled defendant).
 

 I will stipulate that state courts in the nineteenth century "were rarely called upon to assess the constitutionality of statutes that dealt with criminal procedure."
 
 Supra
 
 ¶ 84 (citation omitted). And it seems likely that this grew out of the fact that the historical basis for assuring fair process was "through the common law."
 
 Id.
 
 But that seems to me to cut against the majority's conclusions and in favor of mine. My whole point is that the historical record does not suggest that the nineteenth century understanding of the constitutional right of "due process" would have extended to sentencing proceedings. And for that reason I would leave the development of fair procedure for other (non-constitutional) mechanisms like rulemaking.
 

 It may well be that the lack of any historical right to cross-examination in sentencing was rooted in a longstanding (but today outmoded) faith in "the power of oaths to assure the reliability of evidence."
 
 Supra
 
 ¶ 74 n.9. And the evolution in our thinking about the power of an oath could well be a reason to amend our rules of evidence to allow for more procedure in sentencing. But that doesn't tell us that the historical understanding of due process must likewise evolve in a manner that responds to our modern sensibilities. The Utah Constitution prescribes mechanisms for amendment.
 
 See
 
 Utah Const. art. XXIII, § 1. If the people think that a principle enshrined in the document has outlived its usefulness they are free to initiate the process for amending that principle. But if the guarantee of "due process" was not historically understood to apply to sentencing then it is not the role of a court to revise the principle of due process to conform to modern sensibilities.
 

 Sentencing is not some "new application" of the principle of due process.
 
 See
 

 supra
 
 ¶ 74 n.9. Sentencing proceedings have been around since well before the founding of our Utah Constitution. So if the founding-era notion of "due process" was not viewed as extending to sentencing then the due process guarantee doesn't apply to sentencing. The scope of the due process guarantee is an aspect of the governing "legal principle." We may now view the thinking behind that principle to be outmoded. But that is at most a basis for amending the constitution. It is not a license for a judicial reformulation. And it certainly isn't a "new application" that the framers hadn't thought about.
 

 It may be that sentencing was more a matter for jury determination during the nineteenth century.
 
 See
 

 supra
 
 ¶ 77. And that may be part of the explanation for a lack of "appellate cases applying procedural protections to the 'sentencing phase' of a criminal proceeding" in the relevant time period.
 
 Supra
 
 ¶ 77. But that doesn't tell us anything of relevance to the question of whether the guarantee of due process was understood to apply in sentencing proceedings. I have cited extensive historical material supporting my answer to that question. The majority, at most, has identified explanations for a lack of historical material cutting the other way. That is insufficient. The burden of establishing the unconstitutionality of existing parole procedures falls on Neese. So if the most that can be said is that the historical record is at best hazy then the burden has not been carried.
 

 Cf.
 

 Apprendi
 
 ,
 
 530 U.S. at 545
 
 ,
 
 120 S.Ct. 2348
 
 (O'Connor, J., dissenting) ("During the age of broad judicial sentencing discretion, judges frequently made sentencing decisions on the basis of facts that they determined for themselves, on less than proof beyond a reasonable doubt,
 
 without eliciting very much concern from civil libertarians
 
 ." (emphasis added) (quoting Gerald E. Lynch,
 
 Towards A Model Penal Code, Second (Federal?): The Challenge of the Special Part
 
 ,
 
 2 Buff. Crim. L. Rev. 297
 
 , 320 (1998) ));
 
 Williams
 
 ,
 
 337 U.S. at 246
 
 ,
 
 69 S.Ct. 1079
 
 ("[B]oth before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. Out-of-court affidavits have been used frequently ...." (citations omitted)).
 

 The majority resists this premise, citing historical material suggesting that parole is based on a "treatment" model and not a principle of mercy or grace.
 
 See
 

 supra
 
 ¶ 87. But "treatment" and "grace" are hardly incompatible. The material cited by the majority suggests not that parole was not a discretionary matter of legislative grace but instead that such discretion was to be exercised with an eye toward prospects for treatment.
 

 The constitutional question presented is whether a discretionary parole decision-whether as an act of grace or as an inquiry into fitness for release under a "treatment" framework-is a proceeding that was historically understood to be protected by the constitutional right to due process. Nothing in the majority's historical materials contradict my conclusion on this core question.
 

 See, e.g.
 
 , Alan C. Michaels,
 
 Trial Rights at Sentencing
 
 ,
 
 supra
 
 , at 1812 n.169 (noting that the reason that defendants were not entitled to see the information to be used at sentencing could "perhaps ... [be] derived from a view that a sentence below the maximum was ... considered a potential act of leniency that created no procedural entitlements") (citing Sanford H. Kadish,
 
 Legal Norm and Discretion in the Police and Sentencing Processes
 
 ,
 
 75 Harv. L. Rev. 904
 
 , 919-20 (1962) ).
 

 A legislative or administrative decision to offer more process, moreover, would not alter the underlying constitutional due process baseline.
 
 Cf.
 

 McMillan v. Pennsylvania
 
 ,
 
 477 U.S. 79
 
 , 92,
 
 106 S.Ct. 2411
 
 ,
 
 91 L.Ed.2d 67
 
 (1986) ("We have some difficulty fathoming why the due process calculus would change simply because the legislature has seen fit to provide sentencing courts with additional guidance.");
 
 see also
 

 Williams
 
 ,
 
 337 U.S. at 250-51
 
 ,
 
 69 S.Ct. 1079
 
 ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts-state and federal-from making progressive efforts to improve the administration of criminal justice."). That is because article I, section 7 's "due process" guarantee is based on the original public understanding of that language in 1896, not the public understanding in 2017. Later developments-whether legal, political, or social-do not change that baseline.
 

 Cf.
 
 Campbell, Law of Sentencing ,
 
 supra
 
 , at § 13:20 ("Just as there is no constitutional right for all offenders to confront witnesses at sentence hearings, there is ... no recognized constitutional right to present witnesses on their behalf.");
 
 Williams
 
 ,
 
 337 U.S. at 250
 
 ,
 
 69 S.Ct. 1079
 
 ("We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.").
 

 See
 
 Hessick & Hessick,
 
 Procedural Rights
 
 ,
 
 supra
 
 , at 190-91 ("[S]entencing courts were not required to provide the reasons for the sentences that they imposed.").
 

 Compare that Board-created right with the historical approach: "Despite repeated litigation on a variety of grounds, disclosure of a court's presentence report was not constitutionally required until a few tribunals started doing so in the late 1970s." Campbell, Law of Sentencing ,
 
 supra
 
 , at § 9:12.
 

 See Mission and Jurisdiction
 
 , Utah Board of Pardons & Parole , https://goo.gl/At6Fes (last visited July 1, 2017) ("The mission ... is to provide fair and balanced release, supervision, and clemency decisions that address community safety, victim needs, offender accountability, risk reduction, and reintegration."); Utah Code § 77-18-5 (allowing the judge and prosecutor to send a statement to the board "with any information which might aid the board");
 
 id.
 
 § 77-27-13(1) (requiring corrections officers to "furnish the board with pertinent information regarding an offender's physical, mental, and social history and his institutional record of behavior, discipline, work, efforts of self-improvement, and attitude toward society").
 

 Cf.
 
 Antonin Scalia, a Matter of Interpretation: Federal Courts and the Law 39 (1997) (rejecting a theory of constitutional interpretation premised on the question of "the
 
 desirable
 
 result for the case at hand," where "the Constitution ... mean[s] what it
 
 ought
 
 to mean[;] Should there be ... a constitutional right to die? If so, there is. Should there be a constitutional right to reclaim a biological child put out for adoption by the other parent? Again, if so, there is. If it is good, it is so." (citations omitted)).